**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| UNJOLEE MOORE,<br><br>Petitioner,<br><br>v.<br><br>BRIAN ELLER,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.: 1:23-CV-14-KAC-CHS |

**MEMORANDUM OPINION AND ORDER**

Petitioner Unjolee Moore, a prisoner serving a life sentence in Tennessee Department of Correction custody, filed a pro se federal habeas petition under 28 U.S.C. § 2254 [*See* Doc. 1]. He challenges the legality of his confinement under Hamilton County Criminal Court judgments of conviction for first-degree felony murder, attempted especially aggravated robbery, attempted second-degree murder, and the employment of a firearm during the commission of or attempt to commit a dangerous felony [*See id.*]. No evidentiary hearing is warranted. *See* Rules Governing § 2254 Cases, Rule 8(a); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). For the reasons below, the Court **DENIES** the Petition.

## I. SUMMARY OF EVIDENCE AND PROCEDURAL HISTORY[1]

On direct appeal, the Tennessee Court of Criminal Appeals ("TCCA") summarized the relevant facts presented at Petitioner's trial[2]:

> The defendant's convictions stem from a plan laid by the defendant and his co-defendants, Steven James Ballou, Harold Francis Butler, and John Thomas Simpson, to rob the murder victim, Bernard Hughes. According to the defendant's

[1] The Court has reviewed the complete State court record. The Tennessee Court of Criminal Appeals's factual summaries are generally accurate and concise. And Petitioner does not dispute these factual recitations [*See, e.g.*, Docs. 1, 18]. Where necessary, the Court addresses additional facts from the record in its analysis.

[2] The summaries refers to Petitioner as "defendant."

statement to police, he planned to rob the murder victim because the victim sold marijuana and would not call the police. When two of the co-defendants demanded the victim's money, the victim resisted the robbery and was killed. The victim's friend, Tim Westfield, sustained a gunshot wound when he attempted to aid the victim in fighting off two of the co-defendants. The defendant acknowledged to police that he was the driver and had helped to plan the crime. In his statement, he implied that Myra Collier, a witness who was present in the victim's home, might have been involved with the robbery.

The defense moved, prior to trial, to suppress the defendant's statement to police, arguing that he had been denied his right to counsel and that he had not signed a rights waiver. The defendant also asserted that he was entitled to relief based on law enforcement's failure to record the entire interview in which he gave his statement. The transcript of the hearing on this motion is not part of the record before us. In its written order, the trial court summarized the testimony at the suppression hearing by noting that Investigator Michael Wenger had testified that the defendant was advised of his rights and never requested a lawyer. Investigator Wenger noted that the interview was recorded in two separate audio files because the batteries on his recording device failed during the interview. When Investigator Wenger left the room to change the battery, two agents in the Alcohol, Tobacco, and Firearms division continued to speak to the defendant, and this portion of the interview was summarized in their report. At some point after the batteries were replaced, the memory on the device became full, and it could no longer record. Investigator Wenger had experienced problems with the device on three or four prior occasions. According to the trial court's order, the defendant testified that he did not sign the rights waiver and that he had asked for a lawyer several times. The trial court denied the motion to suppress the statement or to dismiss the indictment for failure to preserve the entire statement, but the court stated it would give an instruction to the jury regarding the break in the recording.

Prior to trial, the defendant also joined the other co-defendants in moving to dismiss the indictment based on law enforcement's failure to collect a cellular telephone that had belonged to co-defendant Harold Butler. The transcript of this hearing has been supplemented per the defendant's request and is now a part of the appellate record. Investigator Wenger testified that on July 13, 2010, after the defendant's arrest, he received a call from the fugitive division informing him that the telephone of Harold Butler had been found. The telephone was not in Mr. Butler's possession, however, but in the possession of Antonio Watkins. Investigator Wenger testified that Lieutenant Edwin McPherson was on the scene and that Lieutenant McPherson told him "not to take the phone and to not question anyone about it." When he asked why, Lieutenant McPherson told him that the federal marshals on the scene needed it. Investigator Wenger then received a call from his commander, Sergeant Bill Phillips, telling him that he was to obey the order from Lieutenant McPherson. Sergeant Phillips confirmed that he called Investigator Wenger, and he testified that he was prompted to do so by Lieutenant Eidson, who instructed him to tell Investigator Wenger to "to leave the phone alone." Sergeant Phillips asked

Investigator Wenger to note the interaction in his report, and Sergeant Phillips testified that he had never had such a request in twenty-three years.

Investigator Wenger testified that the federal marshals told him they no longer needed the telephone and that they then talked to Lieutenant McPherson. As a result, Lieutenant McPherson said, "Well, go ahead and interview Mr. Watkins about it, but don't take the phone." Investigator Wenger testified that he believed it was an iPhone and that he was not able to navigate the telephone. As a result, he was able to find pictures of Mr. Butler but was not able to find the text messages or any associated social media accounts. Mr. Watkins told Investigator Wenger that he had bought the telephone three days earlier. Investigator Wenger did not find anything of significance to the investigation on the telephone. He stated that he believed he was able to get call records for Mr. Butler, and that what might have been lost "was stuff that was actually stored in the phone."

Lieutenant McPherson testified that Myra Collier, one of the witnesses to the murder, was his niece. He stated it was "possible" that she gave him information on the case. When asked if she had called him on June 29, 2010, he responded that he had put her in touch with Investigator Wenger. Lieutenant McPherson did not deny ordering Investigator Wenger not to recover the telephone and or speaking to Lieutenant Eidson, but he stated that he did not recall doing either.

Mr. Watkins testified that he had bought the telephone from a man in front of the "Okey-Dokey." He denied that the man was Mr. Butler, and he stated that the telephone had no photos or other information on it when he got it. He stated that he had owned "a thousand" telephones since that time, that he does not keep telephones long, and that he has never had an iPhone. He recalled that the telephone was "cheap" but denied telling police that he got it from a man and a woman in a white Altima or that he traded two "dime bags" of marijuana for it. Investigator Wenger testified in rebuttal that Mr. Watkins had said that he bought the telephone from Mr. Butler, who was the passenger in a white Altima, and that Mr. Watkins stated the telephone was given in exchange for two "dime bags" of marijuana. The trial court denied the motion to dismiss, concluding that the materiality of the telephone was "entirely speculative."

At trial, Myra Collier testified that she had known the victim for sixteen years and that he was her best friend. Ms. Collier had been in a relationship with one of the co-defendants, Mr. Ballou, and he and the defendant were acquainted with the victim because they had come to the victim's house a few months prior to the homicide to see Ms. Collier. The victim sold marijuana from his house.

On June 28, 2010, Ms. Collier and Cindy Cross spent the afternoon at the victim's apartment. After dinner, Timothy Westfield came to see the victim. Ms. Collier testified that they had obtained liquor prior to Mr. Westfield's arrival but that she did not think they had consumed much alcohol. She acknowledged that, according

to a crime scene photograph, the bottle of gin they had been consuming contained only about one-half of one inch of liquid.

Ms. Collier testified at trial, although Ms. Cross did not. Ms. Collier testified that she did not hear the knock when the assailants came to the door because she was in the bathroom. When she emerged, Ms. Cross told Ms. Collier that she thought the victim was being robbed, and Ms. Cross said she heard gunshots. The two women ran upstairs. Ms. Collier did not recall Mr. Westfield telling her to go upstairs. She looked out of a window and did not see anything, and she did not hear gunshots herself. The two were upstairs only briefly. When they came down, they unlocked the door and saw the victim lying on the porch, bleeding. Ms. Collier stated she checked the victim's pulse and that he was not breathing. She acknowledged that she did not try to perform CPR despite her prior nursing experience. Ms. Collier testified that she ran to get a police officer who lived at the apartment complex. She did not recall calling 911. She acknowledged having called her uncle, Captain Edwin McPherson, but stated the telephone call occurred prior to the robbery.

On cross-examination, Ms. Collier did not recall telling the police that she did not know the defendant at all, and she stated that she knew his face but did not know his name. She acknowledged having gone on a trip with her cousin Ariel on Memorial Day weekend, but she could not recall if she spoke with the defendant by telephone on that trip. She did not know the location of the telephone to which the defendant may have placed the Memorial Day weekend call. Ms. Collier did not recall telling police that she did not introduce the defendant and the victim, although she testified, "but I guess I probably didn't." She denied having anything to do with the robbery or murder of the victim.

Mr. Westfield, who had known the victim since they were children, testified that he came to the victim's house on June 28, 2010, between 10:30 and 11:00 p.m. to socialize and to help the victim with a computer. When he arrived, two of the victim's friends, Ms. Cross and Ms. Collier, were sitting outside, and the victim was on his way home. The four went inside when the victim arrived, and Ms. Collier's cousin stopped by to borrow some DVDs and then left. The four had been inside at least twenty minutes, and the victim seemed "on edge," when they heard a knock. Mr. Westfield testified that Ms. Collier was not in the bathroom at the time of the knock. Ms. Collier, however, had testified that she was in the bathroom. According to Mr. Westfield, the victim looked out of the peephole, then turned to Mr. Westfield and gave him "a peculiar look." The victim opened the door, went out immediately, and closed the door behind him.

While the door was open, Mr. Westfield saw a shorter man and a taller man standing outside. Mr. Westfield identified the taller man as John Simpson. The shorter man was wearing a "do-rag" or half-mask over his face with two colors, black and teal, and he had a gun. The shorter man was about five feet, four inches tall, had a tall bridge on his nose, and light eyes. Mr. Westfield acknowledged that he did not recognize the man at the time, but he stated that "as soon as I found out who it was,

I knew it went two and two together." At trial he identified the shorter man as Harold Butler, whom he described as unique in appearance. Mr. Westfield testified that Mr. Butler's stature was consistent with wearing a size eight shoe. While the victim was passing out of the door, Mr. Westfield could see that the shorter man had a gun, and he heard the shorter man say, "Lay it down," which was a demand for the victim's possessions.

Mr. Westfield testified that he told the two women to go upstairs and that he went outside to assist the victim. Mr. Westfield testified at first that he opened the door, saw the men scuffling, then shut the door, at which point it jammed. He later stated that the door was jammed when he first tried to open it. One of the women told him that it was only locked, and he opened it and went outside.

Outside, both of the men were hitting the victim on top of the head, and the victim was fighting back. Mr. Westfield leaped at the taller man. He heard three shots and saw two flashes in his eyes, and then everything went black. Mr. Westfield regained consciousness in a bush and saw the victim lying on the porch. He did not see blood at first and attempted to administer cardiopulmonary resuscitation ("CPR"), but "when I blew in his mouth and squeezed his nose, my finger went through his nostril where the bullet went in at and that's how I found the bullet wound, and when I bl[ew] in it, the matter came out of the back of his head." Mr. Westfield observed the shorter man hiding behind the fender of a nearby car, and the man got in a late-model silver car with dark windows. Mr. Westfield saw a shoe and baseball cap at the scene. He discovered that he had a gunshot laceration on his forearm and that the tip of one finger had been essentially severed by a bullet. Mr. Westfield acknowledged that he had told police the shorter man said something like "break yourself" instead of "lay it down," but he testified that the two phrases had the same meaning. He told police that the car was either a Maxima or an Altima. He did not recall saying that the car was gold and not silver, but he did not deny it, explaining that he was "going crazy" at the emergency room. He acknowledged that he only saw two men and that neither of the assailants was the defendant.

Mr. Westfield stated he did not know if the victim had received complaints that too many people were coming to his house, and he stated that the victim had told him that the victim no longer sold marijuana. He did not recall telling law enforcement at the hospital that the victim had been getting complaints because he had too many visitors. Mr. Westfield acknowledged that the victim and his guests had been drinking alcohol on the evening of the homicide.

Investigator Michael Wenger testified that he was assigned to investigate the case. He interviewed witnesses and visited the scene. Investigator Wenger was looking for the defendant and found him in a parked 1999 gold or silver Nissan Maxima on July 9, 2010. The owner of the vehicle and the defendant's girlfriend, Michelle Angel, was in the passenger seat. Investigator Wenger testified that he gave the defendant *Miranda* warnings and that the defendant signed a rights waiver prior the interview. He acknowledged having failed to sign as a witness on the waiver and

stated that he was not aware that the defendant had been in special education or could not read until the eleventh grade. Officer Phillip Narramore and a federal agent were also assisting with the interview. Investigator Wenger testified regarding the failed battery and the memory problem with the recording device. He stated that he left the interview room to download the contents of the recording device, and when he returned "we had gotten most of what we needed, so I didn't continue with the interview." The interview began on July 9th and ended on July 10th. The defendant was permitted to take breaks and given dinner. The interview lasted four to six hours, but the defendant was at the station for ten to twelve hours.

In the recorded interview, the defendant acknowledged his involvement in the crimes. The defendant stated that "Ariel" had told him that the victim sold marijuana. The defendant knew the victim by sight through Ariel but did not know the victim's name. According to the defendant, he and Mr. Butler had spoken about robbing a "dope boy," and they targeted a drug dealer because "[t]o be honest with you those was the easiest ones to get in the street . . . uh . . . cause like a dope boy won't call police." The defendant said that he and Mr. Butler spoke of the robbery at Mr. Butler's house approximately a week before the crimes, and at that time, he told Mr. Butler, "I could use some money too. I told [']em about maybe Bernard." The defendant told Mr. Butler that the victim did not keep a gun. At first, the defendant stated that he and Mr. Butler were alone during the conversation, but he later told police that Mr. Simpson was there as well. The defendant told police that Mr. Butler had a .38 revolver, a Hi-Point .45 caliber firearm, and a pump shotgun at his house.

The defendant also acknowledged that he anticipated sharing in the profits of the robbery. He stated that he "let [Mr. Butler] do it all" and just wanted to "collect a cut on the side." The defendant stated that "[t]hey promised to break me off . . . a little of what I get," and he stated he would gain "[a] cut out of it." More specifically, the defendant expected to get approximately $3,000 if $10,000 were taken, which he stated was forty percent. The defendant would get this money because he "turned him onto it."

At first, the defendant acknowledged only taking the assailants to the apartment earlier in the day, and he denied being on the scene during the homicide. According to the defendant, on the day of the homicide, he took Mr. Butler and another man to the victim's house, where several people standing outside saw them. The defendant told the people that he was not hard to find and drove off. The defendant told police that during the homicide, Mr. Butler was driving a gold Maxima, "[s]ame kind as my girl's."

After police told the defendant that they had evidence putting him at the scene, the defendant admitted that he was "over there," although he insisted that he "never got out of the car." He stated, "I picked [']em up. I dropped [']em off." The defendant told law enforcement that he was in the car behind the apartment the entire time, heard gunshots, and saw Mr. Butler and Mr. Simpson come around a corner. Mr.

Butler was delayed because he had been looking for a lost shoe. According to the defendant, Mr. Simpson was armed with a .38 revolver, and Mr. Butler was armed with a .45 Hi-Point.

The defendant stated at first that he could not see from where he was sitting. However, he eventually described the conflict, noting that after Mr. Butler knocked, Mr. Butler "told [the victim] lay it down." The defendant described a man coming to the victim's aid. According to the defendant, Mr. Butler fired a shot in the air, and Mr. Simpson then emerged from the bushes and fired twice. The defendant stated that Mr. Butler then fired again. The house door opened and closed, and someone inside the house fired out. The defendant dropped Mr. Butler and Mr. Simpson at Mr. Butler's home and then went to his girlfriend's house. The defendant stated that he "didn't expect it to happen like that." He elaborated later that he did not know or expect that anyone would get killed. The defendant told police that they did not acquire anything in the robbery. In his statement, the defendant implied that Ms. Collier "had something to do with it."

Investigator Wenger stated that during his investigation, he spoke with Ms. Collier and discovered that she had called her uncle after the homicide. She had also made two 911 calls that did not go through. He acknowledged that one witness at the scene had seen a tan van and that the defendant also described a tan SUV. Investigator Wenger also acknowledged that both a co-defendant and a witness said that the getaway vehicle hit another car as it was leaving but that he was unable to locate damage on Ms. Angel's Maxima or any car at the scene. Investigator Wenger stated that the other officers spoke to the defendant while Investigator Wenger was out of the room and acknowledged that he did not know if the defendant was threatened. He stated that he was not lying when he told the defendant that they could place him at the scene because law enforcement had telephone records indicating that the defendant was there. Investigator Wenger acknowledged that a woman named Ariel had been in an argument that night with the victim and that her telephone records were not investigated. Police did not locate the two weapons which fired the shots, but they found a pump shotgun at Mr. Butler's residence. Officer Narramore of the Chattanooga Police Department testified that he did not remember questioning the defendant while Investigator Wenger was out of the room. Neither he nor the federal agent threatened or coerced the defendant during the interview.

Police officers found a live round and two bullet casings at the scene. A bullet was recovered from the frame of the doorway. They also discovered a baseball cap and a size 8 shoe. They swabbed a pool of vomit or bodily fluid found beside a vehicle.

From the gold Maxima, law enforcement recovered two cellular telephones, a ski-mask type facial wrap, a turquoise blue bandana, and a pair of size 8 1/2 shoes from the trunk. Investigator Kenneth Burnette, Jr., acknowledged that he did not collect another pair of shoes in the trunk and that he did not know if the size 8 1/2 shoes

were men's or women's. He stated that he also recovered guns from the home of the defendant's mother and girlfriend.

Dr. James Metcalfe, the medical examiner, testified that the victim had marijuana in his system and a blood alcohol content of .139 percent. The victim died of two gunshot wounds, both of which were fatal. One bullet entered the victim's left chest toward the back, traveled through both lungs and the heart, exited the chest, and lodged in the right arm above the elbow. The other bullet entered his right temple and eventually lodged by the left occipital bone. The medical examiner testified that blood was coming from the victim's nostrils but that his nasal bones appeared intact. He also testified that the victim's ribs did not show breakage or other signs of CPR but that he could not rule out that CPR had been performed. The victim exhibited no bruising showing his head or body had been "stomped" or struck with a hard object, but he had an abrasion near the belly button, an abrasion on the left hand, and two scrapes on the left shoulder. The victim had $97 and a "dagger" in his pocket.

The shoe recovered from the scene had DNA that was a mixture from at least three individuals. Dr. Laura Boos, a special agent forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified that she was able to exclude the victim, the defendant, and two of the co-defendants as contributors. The test was inconclusive regarding whether Mr. Westfield or Mr. Butler were contributors to the DNA in the shoe. The defendant's DNA was recovered from the black facial wrap found in the trunk of his girlfriend's car. The blue bandana from the car had DNA that was a mixture from three individuals. The test excluded all the profiles submitted except the defendant, and it was inconclusive regarding whether the defendant was a contributor.

Steve Scott, who is employed with the firearms identification unit of the TBI, testified that the victim's clothing did not have gunshot residue, which could mean that the gunshots were fired from more than four feet away or it could mean that they were fired from closer but something interfered with the residue. The bullet recovered from the victim's head was a .45 caliber bullet which exhibited riffling produced by guns made by Hi-Point firearms company. The bullet recovered from the doorway was also a .45 caliber bullet, and it was fired from the same weapon that fired the bullet that lodged in the victim's head. The bullet from the victim's arm was a .38 or .357 bullet. Agent Scott determined that the two .45 caliber casings found at the scene "had been fired in one firearm and one firearm only," which was manufactured by Hi-Point. Agent Scott testified that none of the firearms sent to him in the investigation had fired the bullets. He acknowledged that the gun which fired the bullet in the victim's arm could have been a .357 caliber weapon. He also acknowledged that a custom-made weapon which was not a Hi-Point firearm might have fired the .45 caliber bullets.

During trial, the court revisited the issue of the loss of the telephone. Defense counsel stated that there was an internal investigation into the failure to recover the

telephone and that an investigator had found that Lieutenant McPherson was not being truthful. The trial court found that it was "improper" that the telephone had not been collected. However, the court found that there would be no exculpatory value in Mr. Butler's telephone for the defendant.

After the close of the State's proof, the State objected to the trial court's intention to give an instruction on lost evidence with regard to the partial recording of the defendant's statement. Relying on *State v. Joshua Eugene Anderson*, No. E2005-02660CCA-R3-CD, 2007 WL 1958641, at *8 (Tenn. Crim. App. July 6, 2007), the trial court elected not to give the jury charge.

The jury found the defendant guilty of first[-]degree felony murder, attempted especially aggravated robbery, attempted second[-]degree murder as a lesser included offense of attempted first[-]degree murder, and employment of a firearm during the commission of a dangerous offense. The defendant received a life sentence for the felony murder, fifteen-year sentences for the especially aggravated robbery and the attempted second[-] degree murder, and a six-year sentence for the weapons offense. The weapons offense was ordered to run consecutively to the attempted second[-]degree murder conviction, and the other sentences were ordered to be served concurrently with one another.

*State v. Moore*, No. E2015-00942-CCA-R3-CD, 2016 WL 5210866, at *1-6 (Tenn. Crim. App. Sept. 20, 2016), *perm. app. denied* (Tenn. Jan. 18, 2017) ("*Moore I*"). The TCCA affirmed on appeal. *Id.* at *12. The Tennessee Supreme Court denied Petitioner permission to appeal [Doc. 11-21]. Petitioner did not file a petition for writ of certiorari [*See, e.g.*, Doc. 1 at 3].

On March 28, 2017, Petitioner filed a pro se petition for post-conviction relief in the state court [Doc. 11-22 at 4-11]. That court appointed counsel to represent Petitioner, [*id.* at 20-21], and counsel filed an amended petition for post-conviction relief, [*id.* at 33-49]. Following an evidentiary hearing, the post-conviction court denied relief [*Id.* at 56-82]. Petitioner timely asked the post-conviction court to reconsider its denial [*Id.* at 83-85]. The post-conviction court granted the motion and reopened Petitioner's post-conviction proceedings [*Id.* at 92]. After a rehearing, the post-conviction court again denied relief [*Id.* at 95-133].

The TCCA summarized the procedural history and evidence adduced during these post-conviction proceedings:

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely petition for post-conviction relief, claiming that he received the ineffective assistance of counsel. The post-conviction court appointed counsel, and counsel filed an amended petition, claiming that the Petitioner received the ineffective assistance of counsel because trial counsel (1) failed to file a motion for a continuance when the State provided trial counsel with the Petitioner's audio-recorded confession just one week before trial; (2) failed to call alibi witnesses at trial; (3) failed to call witnesses who could explain why the Petitioner's DNA was on the black facial wrap found in the trunk of Ms. Angel's car; and (4) failed to file a motion in limine or raise a timely objection to testimony about the firearms, ammunition, and bulletproof vest that were found in Ms. Angel's home. The amended petition also alleged that the Petitioner received the ineffective assistance of counsel because appellate counsel failed to include the transcript of the suppression hearing with the direct appeal record and failed to raise on appeal that the trial court should have granted a mistrial because a juror discussed facts outside of the case with other jurors. Finally, the amended petition alleged that newly discovered scientific evidence in the form of a letter showed that the Petitioner was actually innocent of the crimes. Specifically, a letter written by codefendant Simpson alleged that the victim was killed during a fight with Simpson "over a woman, not during a robbery."

The post-conviction court held an evidentiary hearing on August 13, 2018. At the hearing, the then thirty-two-year-old Petitioner testified that on the morning of June 28, 2010, the day of the crimes, he went to work. He left work about 6:00 p.m. and "hung" with his younger brother "for a little bit." The Petitioner left his brother's house and "hung" with Octavia Rucker, whom he described as a "lady friend." The Petitioner returned to his brother's house with Ms. Rucker. About 11:50 p.m. or midnight, the Petitioner, Ms. Rucker, and the Petitioner's brother left in Ms. Rucker's vehicle to get something to eat on Brainerd Road. After getting something to eat, the Petitioner and Ms. Rucker drove the Petitioner's brother back to the Petitioner's brother's house, and the Petitioner and Ms. Rucker went to Ms. Rucker's house on McCallie Avenue. The victim was killed about 11:30 p.m. at the British Woods Apartments on Oakwood Drive. The Petitioner said that at that time, he and Ms. Rucker were with the Petitioner's brother.

The Petitioner testified that the next morning, he left Ms. Rucker's house and went to his second job mowing grass for New England Baptist Church. The Petitioner said he used a "facial wrap" to protect his face when he mowed grass. Officers from the Chattanooga Police Department (CPD) arrested the Petitioner on July 9, 2010. They transported him to the Police Service Center on Amnicola Highway and handcuffed him to a bench in a hallway. The Petitioner said that he arrived at the Police Service Center about 2:30 p.m. and that he sat on the bench for three and one-half to four hours. During that time, a patrolman stayed with the Petitioner and told the Petitioner that the Petitioner was "a piece of [sh*t]" and "a murderer."

The Petitioner testified when Investigator Wenger arrived at the Police Service Center, Investigator Wenger began punching him and demanding that he tell the truth. Investigator Wenger "punched" the Petitioner's left eye, and the patrolman "joined in." The Petitioner said that Investigator Wenger and the patrolman were "tag teaming" and that they beat him "[o]ff and on" in the hallway for three hours. The Petitioner said that Investigator Wenger would ask him questions and then would leave him alone with the patrolman. While Investigator Wenger was gone, the Petitioner and the patrolman "continued to get into it." When Investigator Wenger returned, he would ask the Petitioner more questions and continue beating him. The Petitioner said that the officers never took him to an interview room and that he never realized he was being "interrogated."

The Petitioner testified that at some point, Officer Narramore and another officer "came in." Investigator Wenger and Officer Narramore began questioning the Petitioner about the victim's death. The officers never advised the Petitioner of his rights or had him sign a waiver of rights form. Post-conviction counsel showed the Petitioner a signed waiver of rights form, and the Petitioner denied signing the form.

The Petitioner testified that during his interrogation, Investigator Wenger claimed the Petitioner's cellular telephone records showed the Petitioner was in the area of the British Woods Apartments at the time of the crimes. The Petitioner acknowledged that Investigator Wenger had obtained the Petitioner's cellular telephone records from Verizon[footnote omitted]. Post-conviction counsel introduced the records into evidence at the evidentiary hearing and showed them to the Petitioner. The Petitioner stated that according to the records, he was at 2338 McCallie Avenue at 11:40 p.m. on June 28, 2010. The Petitioner said that the distance from McCallie Avenue to the British Woods Apartments was about ten and one-half miles and that it would have taken him twenty to twenty-five minutes to drive from McCallie Avenue to the apartment complex. Therefore, the Petitioner knew Investigator Wenger was lying when the investigator claimed the records put the Petitioner at the crime scene.

The Petitioner acknowledged that he confessed to the crimes but said that he did so because he was "tired of getting punched on," tired of being handcuffed to the bench, and wanted to go home. The Petitioner said that his confession was audio recorded but that parts of his confession did not make sense, which indicated that the recording had been "slic[ed]." After he gave his confession, the Petitioner was "booked" into the Hamilton County Jail. The Petitioner's intake officer noticed his injuries and called for medical personnel. The Petitioner identified his medical form from the jail and read from the form as follows: "'Evaluated inmate, a laceration believed to be from CPD, right wrist to hand. Discomfort, swelling to left eye.'"

The Petitioner testified that about one and one-half years after he was indicted for the crimes, trial counsel was appointed to represent him. Trial counsel had never handled a murder case prior to the Petitioner's case. The Petitioner told trial counsel about the injuries he received at the Police Service Center, but trial counsel never

contacted the Hamilton County Jail and never reviewed the Petitioner's medical records. The Petitioner also told trial counsel where he was at the time of the crimes, but trial counsel did not try to obtain any evidence to prove the Petitioner's alibi. Trial counsel received funds to hire a private investigator, but the Petitioner met the investigator only one time in three years. The Petitioner told the investigator the "basic facts" of his case and gave Ms. Rucker's name to the investigator. Trial counsel never said anything to the Petitioner about the Petitioner's cellular telephone records.

The Petitioner testified that trial counsel filed a motion to suppress the Petitioner's confession and that the prosecutor gave trial counsel a "disk" containing the confession. The State made an offer for the Petitioner to plead guilty in exchange for a sentence of twenty-five years to be served at thirty percent for his testimony against his codefendants. However, the Petitioner could not testify against his codefendants because he was not at the scene of the crimes; therefore, he could not accept the State's offer. On the morning of trial, trial counsel was not prepared, so the Petitioner asked trial counsel to recuse himself from the case. Trial counsel left the Petitioner's holding cell for five or ten minutes but returned and told the Petitioner that the trial court would not allow trial counsel to "step off" the case. During the Petitioner's trial, he learned for the first time that his confession had been audio recorded and that the recording had been transcribed.

The Petitioner testified that at some point during his trial, the bailiff informed the trial court that "one of the jurors was talking with other jurors about knowing the . . . victim's sister and growing up with Mr. Westfield." The trial court dismissed the juror and instructed the remaining jurors not to discuss the case. The Petitioner asked that trial counsel request a mistrial because the Petitioner thought the jury had been "poisoned" by the dismissed juror. The State showed the jury guns owned by the Petitioner's mother; a gun and a bulletproof vest that were discovered in Ms. Angel's house in Fort Oglethorpe, Georgia; and a gun that was found in a codefendant's home. However, none of the items belonged to the Petitioner.

The Petitioner testified that after the State closed its proof, trial counsel told him that the State did not present enough evidence to convict him; therefore, trial counsel was not going to call any of the Petitioner's witnesses, including his alibi witnesses. The Petitioner wanted to testify at trial, but trial counsel advised him not to testify due to his "past." After the jury convicted the Petitioner, trial counsel told the Petitioner that trial counsel "messed up" and "wasn't prepared" for trial. Trial counsel said he would "take the fall for it" and "let the judge know." The Petitioner stated that another attorney represented him on direct appeal of his convictions and that he met with appellate counsel only one time for twenty-five to thirty minutes. The Petitioner told appellate counsel about the "juror issue," but appellate counsel did not raise the issue on appeal.

On cross-examination, the Petitioner acknowledged that his confession consisted of one "lengthy" audio recording and one "very brief" audio recording and that he

gave the police details about the victim's death. He said, though, that Investigator Wenger and Officer Narramore gave him the details and that he was "just piecing things together." The Petitioner knew codefendant Butler prior to the crimes because Butler cut the Petitioner's hair. The Petitioner knew codefendant Ballou "[t]hrough mutual friends." The Petitioner did not know codefendant Simpson. Before this case, the Petitioner served five years, ten months in federal custody for carjacking.

The Petitioner testified that on July 9, 2010, CPD officers arrested him in front of his parents' house for a kidnapping and an especially aggravated robbery that were unrelated to the crimes involving the victim and Mr. Westfield. The officers transported the Petitioner to the Police Service Center, and Investigator Wenger and Officer Narramore ended up questioning him about the crimes against the victim and Mr. Westfield. The charges against the Petitioner for the unrelated kidnapping and especially aggravated robbery were later dismissed. Mr. Ballou also was arrested in the unrelated case, and the Petitioner did not know if Mr. Ballou pled guilty in that case.

The Petitioner testified that on the night of the crimes, he was with Ms. Rucker, who drove a 2000 Ford Explorer. When the Petitioner was arrested on July 9, he was with Ms. Angel, who owned a purple Nissan Maxima. Ms. Angel gave a statement to the police in which she claimed that on the night of the crimes, the Petitioner dropped her off at night school, left in her Maxima, and returned at 4:30 p.m. the next day. The Petitioner said Ms. Angel's statement was not true. He denied being in a relationship with Ms. Angel and said he was "just sleeping" with her. He said he used her car "maybe three times, and that was during the day." The police later searched Ms. Angel's house in Fort Oglethorpe and found a firearm and a bulletproof vest. The items belonged to Ms. Angel's brother, not the Petitioner. The Petitioner said he was not with Ms. Angel or driving her Maxima on the night of the crimes.

The Petitioner testified that trial counsel talked with Ms. Rucker, the Petitioner's mother, and a local pastor before trial. The Petitioner told trial counsel about the Petitioner's brother being an alibi, but the Petitioner did not know whether trial counsel spoke with his brother. The Petitioner said that during his interrogation, he was handcuffed to the bench in the Police Service Center hallway from 2:30 p.m. to 3:00 a.m. The police only allowed him to leave the bench to go to the bathroom, and they did not give him any food or water. Investigator Wenger and the patrolman were the only officers who beat the Petitioner, and they beat him "off and on" for three hours. The Petitioner said he was photographed during his booking at the jail. At that point, the State showed nine photographs to the Petitioner, and he identified them as photographs taken of him at the Police Service Center. He said he thought the photographs were taken before his interrogation. The State asked, "Detective Burnett says he took the pictures at 4:45 a.m. July 10th, is that not true?" The Petitioner answered, "I don't remember that." The State asked the Petitioner to

identify his injuries in the photographs, but the Petitioner was unable to do so. The Petitioner denied writing anything on his jail medical form.

The Petitioner testified that trial counsel filed a motion to suppress his confession and that he told trial counsel he did not sign a waiver of rights form. At the suppression hearing, Investigator Wenger testified that the Petitioner waived his rights and signed the form. The Petitioner also testified at the hearing but did not mention being beaten because he only answered the questions that were presented to him. The Petitioner said that although he admitted to planning the robbery of the victim, he did so because "the detectives told [him what] to say."

The Petitioner testified that he had prior convictions of carjacking and theft of a vehicle. The Petitioner wanted to testify at trial, but trial counsel did not want the jury to learn about his criminal history. The Petitioner disagreed with trial counsel and thought he needed to testify. The trial court held a Momon hearing, and the Petitioner told the trial court that he did not want to testify.

On redirect-examination, post-conviction counsel showed a photograph to the Petitioner. The Petitioner identified the photograph as his "booking picture" and said it showed a "dark bruise" under his left eye. The Petitioner acknowledged that bruises did not always show up clearly on African-Americans. He said that he told trial counsel the officers had beaten him and that he had "no idea" why trial counsel did not raise the issue at the suppression hearing. Upon being questioned by the post-conviction court, the Petitioner acknowledged that he was handcuffed to the bench in a "narrow hallway" of the Police Service Center from 2:30 p.m. until 3:00 a.m. The police officers beat the Petitioner in the hallway. The post-conviction court asked, "[W]hile people were coming and going [in the hallway], you were being beaten?" The Petitioner responded, "No, no. When they disappeared, that's when they will come and fight with me."

Twenty-seven-year-old Jean Hudson testified that the Petitioner was his older brother.[footnote omitted] On the night of June 28, 2010, Mr. Hudson was with the Petitioner. Mr. Hudson explained that the Petitioner telephoned Mr. Hudson and "ended up coming . . . to visit." They "chilled" and talked, picked up Mr. Hudson's stepdaughter, and went to get food at Sonic. Mr. Hudson said that he did not remember the exact time he was with the Petitioner but that it was "around like 11 something." The Petitioner and Mr. Hudson "parted ways after a couple of hours or so." Mr. Hudson estimated that it would have taken twenty to twenty-five minutes to drive from McCallie Avenue to the British Woods Apartments.

On cross-examination, Mr. Hudson testified that on June 28, 2010, he was living on 12th Avenue. The Petitioner telephoned him about 10:00 p.m. and again after 11:00 p.m. The Petitioner came to Mr. Hudson's house and had a "female friend" with him. The Petitioner and the woman were driving an SUV. Mr. Hudson never talked with trial counsel about the Petitioner's case. The State asked Mr. Hudson when he realized that the Petitioner had been with him at the time of the crimes.

Mr. Hudson answered, "Just now, because I didn't know the time of the murder." On redirect-examination, Mr. Hudson testified that he did not come forward with his information earlier because he did not know what time the crimes occurred.

Annette Thompson, the Petitioner's mother, testified that on the night of June 28, 2010, the Petitioner came to her house and took a shower because he "was going to spend some time with a young lady." The next morning, the Petitioner returned to Ms. Thompson's house to take a shower and get his tools so that he could mow the grass at New England Baptist Church. Ms. Thompson said that the Petitioner always wore a black mask when he mowed grass because he had asthma and because he did not want to get grass on his face. Ms. Thompson spoke with trial counsel one time and had an eight-minute telephone conversation with trial counsel's investigator. Trial counsel subpoenaed Ms. Thompson to trial but did not call her to testify. Post-conviction counsel asked if the Petitioner had any "problems," such as learning disabilities, and Ms. Thompson said that he had "several diagnoses." Ms. Thompson said it would have taken a person more than fifteen minutes to get from McCallie Avenue to the British Woods Apartments. On cross-examination, Ms. Thompson said that the Petitioner left her house sometime before midnight on June 28, 2010, and that she did not see him again until 7:30 a.m. the next day.

Investigator Kenneth Burnett testified for the State that on July 10, 2010, he "process[ed]" the Petitioner at the Police Service Center and photographed the Petitioner's face and hands. Investigator Burnett took the photographs at 4:40 a.m. On cross-examination, Investigator Burnett testified that he did not know when the Petitioner was arrested or interrogated but that it could take a bruise "a day or two, could take an hour or two" to be visible on a person.

Trial counsel testified that he was licensed to practice law in 2008 and practiced criminal defense. On December 3, 2010, the trial court appointed trial counsel to represent the Petitioner. Trial counsel said that he did not represent the Petitioner at the Petitioner's preliminary hearing but that he would have reviewed the hearing transcript before trial. Trial counsel filed several motions, including a motion to suppress the Petitioner's confession. At that time, trial counsel did not have a copy of the Petitioner's audio-recorded confession. Trial counsel said he did not think he ever received a transcript of the confession. Nevertheless, trial counsel "could tell from the written discovery that there were problems with Detective Wenger's recorder." Therefore, trial counsel filed the motion to suppress the confession pursuant to the "Ferguson theory." The Petitioner told trial counsel that he had been handcuffed to a bench for "a long time" before being questioned and that he did not sign a waiver of rights form. The Petitioner did not tell trial counsel before or during the suppression hearing that he had been beaten. The trial court denied the motion to suppress.

Trial counsel testified that he received discovery but that he did not receive a copy of the Petitioner's audio-recorded confession until one to three weeks before trial.

Trial counsel reviewed the recording and tried to review it with the Petitioner in jail. However, the Petitioner did not want to review the recording "because he said he remembered what he said." On June 17, 2013, the day before trial, trial counsel filed a motion to reopen the suppression hearing proof and continue the trial, but the trial court denied the motion.

The State showed trial counsel a copy of the motion to reopen and continue the trial. Trial counsel acknowledged that according to the motion he prepared, he received the Petitioner's audio-recorded confession on April 8, 2013, which was a couple of months before trial.

Trial counsel testified that prior to trial, he notified the State about the following defense witnesses: a handwriting expert; a local church pastor; and Ms. Rucker. The handwriting expert had analyzed a note written by codefendant Simpson and had analyzed the signature on the Petitioner's waiver of rights form. Trial counsel filed a notice of alibi with regard to the church pastor and Ms. Rucker, but the Petitioner did not tell trial counsel about Mr. Hudson. Trial counsel met with the church pastor before trial. The pastor could have testified that the Petitioner mowed the grass at New England Baptist Church and used a facial wrap, but the pastor did not "feel comfortable" testifying that the Petitioner mowed the grass at the church on the morning after the crimes. Trial counsel also spoke with Ms. Rucker before trial, and she was "on standby" to testify that the Petitioner was at her home on the night of the crimes. However, Ms. Rucker had some prior theft convictions, and trial counsel "did not have a good feeling about calling her as a witness." Trial counsel ended up not calling any of the witnesses to testify. Trial counsel and the Petitioner discussed whether the Petitioner should testify, but trial counsel thought it was going to be "very tough" for the Petitioner to explain his confession. The Petitioner decided not to testify.

Trial counsel testified that three to six months before trial, he arranged for another attorney to assist him with the Petitioner's case because she had more trial experience than trial counsel. Co-counsel reviewed discovery and met with the Petitioner. During the Petitioner's trial, trial counsel overheard the Petitioner tell co-counsel that police officers had beaten him. Trial counsel explained, "When [the State] played the statements that he gave to Wenger. I believe when there were gaps in the recording, he said that that was when they were beating him."

On cross-examination, trial counsel testified that after he was appointed to the Petitioner's case, he met with the Petitioner in jail. Although the Petitioner's case was trial counsel's first murder case, he did not think he mentioned that fact to the Petitioner. Trial counsel acknowledged that he did not ask the Petitioner if the police had beaten the Petitioner but said that "I would think . . . that would have probably been something he would have wanted to tell me." During the Petitioner's interrogation, Investigator Wenger claimed he could put the Petitioner at the scene of the crimes. Trial counsel cross-examined Investigator Wenger about that claim at trial and suggested that Investigator Wenger was "bluffing." Investigator Wenger

then testified that he had cellular telephone records to show the Petitioner was at the crime scene and that the records were in the "master case file."

Trial counsel testified that he had received the master case file in discovery but that he did not think he ever saw cellular telephone records. At that point, post-conviction counsel showed the cellular telephone records to trial counsel, and trial counsel reviewed them briefly. Trial counsel said that according to handwritten notes with the records, the Petitioner was at 2338 McCallie Avenue at 11:40 p.m. on June 28, 2010. Trial counsel acknowledged that at trial, Mr. Westfield testified that the knock on the victim's door may have occurred at "11:30 or so." Trial counsel said it would have been "very difficult" for the Petitioner to have traveled from the crime scene to McCallie Avenue in ten minutes. Trial counsel stated that in hindsight, the telephone records "would have been very helpful" to contradict Investigator Wenger's testimony that the Petitioner was at the crime scene.

Trial counsel testified that during the trial, the jury heard statements about guns and a bulletproof vest. Trial counsel made a motion to redact the statements, and the trial court granted the motion. Trial counsel said that he should have filed the motion before trial so that the jury would not have heard about the prejudicial evidence. Trial counsel said that he also should have filed the motion to continue the trial earlier and that the motion was his "last-ditch" effort for more time to prepare for trial.

Trial counsel testified that he decided not to call the handwriting expert as a witness at trial because the expert either did not have enough information to analyze the signature on the waiver of rights form or the expert was not going to provide a "good" report. Trial counsel acknowledged that even though Reverend Ballard did not want to testify as an alibi witness, Reverend Ballard could have verified the Petitioner's use of the facial wrap. Trial counsel said he did not remember the Petitioner's mother being able to provide any information helpful to the defense. He acknowledged, though, that she could have testified that the Petitioner used the facial wrap when the Petitioner mowed grass. Trial counsel said that he and the Petitioner were "both unhappy" with the jury's verdicts and that he probably said something to the Petitioner after the verdicts about being an inexperienced attorney. On redirect-examination, trial counsel clarified that he thought the addresses on the Petitioner's cellular telephone records were the locations for cellular telephone towers, not the locations for the Petitioner's telephone.

On September 24, 2018, the post-conviction court entered an order finding that the Petitioner was not entitled to relief on any of the issues raised in the petition or at the evidentiary hearing. Regarding the Petitioner's claim that trial counsel was ineffective because trial counsel failed to use the Petitioner's cellular telephone records at trial, the post-conviction court noted that the Petitioner did not have an expert witness testify about the records at the evidentiary hearing and found that the records did not establish the Petitioner was not at the crime scene. Thus, the

post-conviction court found that the Petitioner failed to demonstrate that he was prejudiced by trial counsel's failure to use the records.

On October 11, 2018, the Petitioner filed a "motion to reconsider," requesting that he be allowed to present expert testimony about his cellular telephone records. In support of his motion, the Petitioner attached an affidavit from Glen Buckley, which was dated October 10, 2018. In the affidavit, Mr. Buckley stated that he was a licensed private investigator and a forensic examiner certified by Cellebrite, an electronic mobile device forensics company. He stated that at post-conviction counsel's request, he had reviewed "Call Detail Records and maps" prepared by the State in the Petitioner's case. Mr. Buckley concluded that the Petitioner's cellular telephone records created reasonable doubt that the Petitioner was at the crime scene.

On October 15, 2018, the post-conviction court entered an order granting the Petitioner's motion. In the order, the post-conviction court found that the court still had jurisdiction to amend its September 21, 2018 order denying post-conviction relief. The post-conviction court vacated its September 21 order and directed that the post-conviction evidentiary hearing be "reopened" for additional proof.

The post-conviction court held a second post-conviction evidentiary hearing on May 18, 2019. During the hearing, Mr. Buckley gave expert testimony that he had reviewed the cellular telephone records that were introduced into evidence at the first hearing. He also reviewed a map that showed the crime scene and various cellular telephone towers that communicated with the Petitioner's telephone on the night of the crimes. The map had been prepared by the State's expert using CellHawk software. The Petitioner's records did not include the latitude and longitude for his cellular telephone, so Mr. Buckley could not determine the location of the telephone at the time of a particular call. Instead, he could only use the records to determine the location of the cellular telephone towers that communicated with the telephone. The records were consistent with the map prepared by the State's expert.

Mr. Buckley testified that at 11:30 p.m. on June 28, 2010, the Petitioner's telephone was about five and one-half miles from the crime scene. At 12:08 a.m. on June 29, 2010, the Petitioner's telephone was "just underneath and to the right" of the crime scene on the State's map.

On cross-examination, Mr. Buckley testified that he did not know the name of the service provider for the telephone records because the name was not on the records. However, evidence he received for review indicated that Cricket was the service provider; therefore, he prepared his own map showing the locations of various Cricket towers in relation to the crime scene. He said he thought a Verizon device could communicate with Cricket towers.

The State showed Mr. Buckley a police incident report.[footnote omitted] According to the report, police officers were dispatched to the British Woods Apartments at 12:03 a.m. on June 29, 2010. Mr. Buckley said that at 12:08 a.m., the Petitioner's cellular telephone communicated with tower 987 on the State's map. The tower was just one and one-half miles from the apartment complex.

Mark Hamilton testified as an expert for the State that he worked in technical forensics for the CPD. Mr. Hamilton reviewed the Petitioner's cellular telephone records and used CellHawk software to prepare the map that was provided to Mr. Buckley. Although "Verizon" was not printed on the records, the records were "easily discernable" as Verizon records. He said a Verizon device could not communicate with a Cricket tower.

Mr. Hamilton testified that the Petitioner's cellular telephone records were consistent with the Petitioner's traveling toward the crime scene at 11:40 p.m. on June 28, 2010. The police were dispatched to the crime scene at 12:03 a.m. on June 29. At 12:08 a.m., the Petitioner's telephone connected with Verizon tower 987, which was consistent with someone leaving the crime scene. Mr. Hamilton stated that although the Petitioner claimed the Petitioner was with Mr. Hudson on 12th Avenue between 11:10 a.m. and 1:10 a.m., that claim was not consistent with the records. The Petitioner's claim that he went to get food on Brainerd Road during that time also was not consistent with the records.

On cross-examination, Mr. Hamilton testified that the Petitioner asserted as his alibi that he was "stationary" at someone's house during the crimes. However, the Petitioner's cellular telephone records showed that his telephone was "moving all over the place." Mr. Hamilton acknowledged that the Petitioner's telephone was not in the area of the crime scene at 11:30 p.m.

On May 21, 2019, the post-conviction court entered a second order denying post-conviction relief. Relevant to this appeal, the post-conviction court first addressed the Petitioner's claim that trial counsel was ineffective for failing to file a motion in limine regarding evidence that firearms, ammunition, and a bulletproof vest were found in Ms. Angel's home in Fort Oglethorpe. The post-conviction court noted that the State could not connect the items to the Petitioner at trial. However, the post-conviction court concluded that even if trial counsel was deficient for not objecting to the evidence before trial, the Petitioner failed to demonstrate prejudice because his confession and his details about the crimes rendered the improper evidence "inconsequential." As to the Petitioner's claim that trial counsel should have filed a motion to continue the trial earlier so that trial counsel could have reviewed the Petitioner's audio-recorded confession, the post-conviction court found that trial counsel received the recording in April 2013, "several weeks" before the Petitioner's June 2013 trial. The post-conviction court also found that before trial, trial counsel was able to challenge the State's failure to record the entire interview pursuant to Ferguson. Thus, the post-conviction court found that the Petitioner failed to demonstrate prejudice. The post-conviction court found that the

Petitioner's testimony about being beaten was "too late to be credible" and that his medical form and photographs did not "confirm" any injuries. Therefore, the post-conviction court found that trial counsel was not deficient for failing to raise the issue in the motion to suppress.

As to the Petitioner's claim that trial counsel was ineffective for not calling alibi witnesses at trial, the post-conviction court noted that according to the Petitioner's notice of alibi, which was filed on May 10, 2013, the Petitioner was with Ms. Rucker at her residence on the night of the crimes. The post-conviction court accredited trial counsel's testimony that the Petitioner did not notify trial counsel about Mr. Hudson's being an alibi witness and stated, "[The Petitioner's] present alibi seems to be an attempt to be consistent with the phone records." Thus, the post-conviction court found that the Petitioner was not entitled to relief on this issue. Regarding the Petitioner's claim that trial counsel was ineffective for failing to use the Petitioner's cellular telephone records at trial to show he was not at the crime scene, the post-conviction court noted that Mr. Westfield "estimate[ed]" the time of the crimes as 11:30 p.m. but that the police were not dispatched to the scene until 12:03 a.m., which was "a more accurate indication of the time of the offense[s]." The post-conviction court concluded that although the State did not present the time of dispatch as evidence at trial, the State would have done so if trial counsel had tried to use the Petitioner's cellular telephone records. Therefore, the post-conviction court found that the Petitioner was not prejudiced by trial counsel's failure to use the cellular telephone records.

Next, the post-conviction court addressed the Petitioner's claim that trial counsel was ineffective for failing to call witnesses to testify that the Petitioner regularly wore the black facial wrap when he mowed grass. The post-conviction court found that even if the Petitioner wore the facial wrap to mow grass at the church, it was possible that a codefendant was wearing the facial wrap with a blue bandana at the time of the crimes. Therefore, the post-conviction court again found that the Petitioner failed to demonstrate prejudice.

Finally, the post-conviction court addressed the Petitioner's claims that appellate counsel was ineffective for failing to raise the juror issue on direct appeal of the Petitioner's convictions, for failing to include the suppression hearing transcript in the direct appeal record, and for failing to argue on direct appeal of his convictions that he did not receive Miranda warnings prior to his confession and that he did not sign a waiver of rights form. The post-conviction court noted that the trial court questioned and dismissed the juror at issue and that there was no proof in the post-conviction record that the dismissed juror talked with other jurors. As to the omitted transcript, the post-conviction court noted that appellate counsel argued on appeal that the State's failure to preserve the Petitioner's entire confession violated Ferguson but that the suppression hearing transcript was not necessary for this court to address the issue. Regarding the Petitioner's confession, the post-conviction court found the Petitioner not credible when he testified that he did not receive

> Miranda warnings and did not sign the waiver of rights form. Accordingly, the post-conviction court denied the petition for post-conviction relief.

*Moore v. State*, No. E2019-01076-CCA-R3-PC, 2021 WL 4705190, at *6-14 (Tenn. Crim. App. Oct. 8, 2021), *perm. app. denied* (Tenn. Feb. 10, 2022) ("*Moore II*"). The Tennessee Supreme Court denied permission to appeal [Doc. 11-39].

On January 14, 2023,[3] Petitioner timely filed a federal habeas petition raising five (5) grounds for relief, liberally construed:

> I. Trial counsel was ineffective in failing to adequately prepare for trial and raise (a) that "the police assaulted Mr. Moore during interrogation" and (b) the cell phone records purportedly placing Petitioner away from the crime scene.
>
> II. Trial counsel was ineffective for failing to present witnesses to explain Petitioner's DNA on a black facial wrap found in the alleged getaway car.
>
> III. Trial counsel was ineffective in failing to present alibi witness testimony.
>
> IV. Trial counsel was ineffective in failing to file a motion in limine to exclude evidence collected from the home of Petitioner's then-girlfriend.
>
> V. And appellate counsel was ineffective in failing to raise the issue of a "tainted juror" on direct appeal.

[Doc. 1 at 4]. The Court ordered Respondent to file a response to the Petition and the State-court record [Doc. 8]. Respondent filed the State-court record on June 12, 2023, [Doc. 11], and an Answer on June 19, 2023, [Doc. 13]. On July 12, 2023, Petitioner asked to stay his Petition and hold it in abeyance while he sought to reopen post-conviction proceedings in State court [Doc. 14].

---

[3] The Court presumes that the date Petitioner handed the Petition to prison authorities is the date the Petition is postmarked [*See* Doc. 1-3]. *See also Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008); *see also Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002) (holding that an application is deemed filed when handed to prison authorities for mailing to the federal court).

Then, in November 2023, he moved to withdraw his Petition [Doc. 15]. A little more than a week after moving to withdraw, however, Petitioner filed a notice asking the Court to disregard his motion to withdraw [Doc. 16]. And on December 1, 2023, the Court entered an Order denying Petitioner's motion to stay these proceedings and denying his motion to withdraw [Doc. 17].

Over ten months later, on or about October 17, 2024, Petitioner filed a reply to Respondent's Answer addressing his initial habeas claims and raising three (3) additional purported grounds for relief:

> I. Appellate counsel was ineffective in failing to file a motion for a new trial based on an alleged jury instruction error.
>
> II. Appellate counsel was ineffective in failing to raise the issue of the trial judge's alleged conflict of interest.
>
> III. Petitioner's conviction is a miscarriage of justice.

[Doc. 18]. This matter is ripe.[4]

## II. ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs here. AEDPA permits relief on a claim adjudicated on the merits in state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro*, 550 U.S. at 473. When evaluating the evidence presented in the state court, this Court presumes the correctness of the state court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

[4] The Court denied Plaintiff's later request to amend his habeas petition [*See* Doc. 22].

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court's decision is an "unreasonable application" of Supreme Court precedent if the state court applies the correct legal principle to the facts in an unreasonable way. *Id.* at 407-08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *See Schriro*, 550 U.S. at 473; *see also Williams*, 529 U.S. at 410-11. The state court ruling generally must be "so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Also the petitioner must have exhausted his available state remedies for a claim. 28 U.S.C. §2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to have "fairly presented" each federal claim to all levels of the state appellate system to ensure that state has a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices v. Boston Mun. Court v. Lydon*, 466 U.S. 294, 302-03 (1984)). Fair presentation means that "the substance of a federal habeas corpus claim must first be presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 278 (1971). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (internal citations omitted). The doctrine of exhaustion generally requires a petitioner to present "the same claim under the same theory" to the state court as he seeks to present to the federal court. *Pillette*

*v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *see also Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009) (finding constitutional claim must be presented in federal court under the same theory as presented in state appellate process). In Tennessee, presentation of the claim to the TCCA satisfies this requirement. *See* Tenn. S. Ct. R. 39.

But if a prisoner failed to present a claim to the TCCA and a state procedural rule now bars presentation of the claim, that claim is technically exhausted but procedurally defaulted. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Coleman v. Thompson*, 501 U.S. 722, 731-32, 750 (1991); *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted"); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period); Tenn. Code Ann. § 40-30-102(c) ("one petition" rule).

A procedural default may also occur where "a state procedural rule . . . prevent[ed] the state courts from reaching the merits of the petitioner's claim[.]" *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1997)). A federal court is generally prohibited from considering a federal-law claim "arising from the judgment of a state court if the state judgment rests on a state-law ground that is both independent of the merits of the federal claim and an adequate basis for the state court's decision." *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004) (cleaned up); *see also Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (citing *Tolliver v. Sheets*, 594 F.3d 900, 928 n.11 (6th Cir. 2010)).

In some circumstances, a procedural default may be excused to allow federal habeas review of a claim. This is appropriate if the prisoner can show (1) cause for the default and actual resulting prejudice or (2) that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749-50; *see also Wainwright*, 433 U.S. at 90-91. The exception for a fundamental miscarriage of justice is reserved for the extraordinary case in which

the alleged constitutional error probably resulted in the conviction of one who is "actually innocent of the underlying offense." *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Actual innocence in this context "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). A viable claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). The petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

There must be actual "prejudice" to overcome a default; petitioner bears "the burden of showing, not merely that the errors [in the proceeding] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). And "cause" for a default may be shown if a petitioner establishes that some objective external factor impeded counsel's ability to comply with the state's procedural rules. *See Coleman*, 501 U.S. at 753.

Errors of post-conviction counsel generally do not serve as "cause" to excuse a procedural default. *Id.* at 753-53. But the Supreme Court established an equitable exception to this rule in *Martinez v. Ryan*.[5] The Supreme Court has since explained:

> [The *Martinez* exception] allow[s] a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim;" and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . .

[5] 566 U.S. 1 (2012).

be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 13-14, 16-17). The *Martinez* exception applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792-95 (6th Cir. 2014). But the *Martinez* exception does not excuse a petitioner's failure to develop a factual record for a claim, even if he attributes that failure to the ineffective assistance of his post-conviction counsel. *See Shinn v. Ramirez*, 596 U.S. 366, 384 (2022).

**A. The Claims in Petitioner's Reply Do Not Provide A Basis for Relief.**

As an initial matter, Petitioner filed his reply late. The Court ordered Petitioner to file any reply within twenty-one (21) days of Respondent's Answer [Doc. 8 at 2]. Petitioner filed his reply over a year late [Doc. 18; *see also* Doc. 13]. But for Petitioner's benefit, and because the late reply does not prejudice Respondent or impact the outcome of the Petition, the Court addresses the claims in the late Reply. These claims, however, are untimely and procedurally defaulted.

**1. The Claims In The Reply Are Untimely.**

AEDPA provides a one-year statute of limitations for filing a Section 2254 petition. 28 U.S.C. § 2244(d)(1). As relevant here, that period runs from "the date on which the judgment became final by the conclusion of direct review." 28 U.S.C. § 2254(d)(1)(A).

Here, the AEDPA statute of limitations would have begun to run on April 19, 2017, the day after Petitioner's ninety-day window to request review of his conviction by the United States Supreme Court closed. *See Clay v. United States*, 537 U.S. 522, 524 (2003) (holding that, if no petition for certiorari is filed, the judgment becomes final upon expiration of the ninety-day period for seeking certiorari review in the Supreme Court). But Petitioner filed his pro se petition for post-conviction relief on March 28, 2017, [Doc. 11-22 at 4], before that deadline expired. This paused the start of the limitations clock. *See* 28 U.S.C. § 2244(d)(2). The pause continued until

February 11, 2022, the day after the Tennessee Supreme Court denied review of the Tennessee Court of Appeals's affirmance of the denial of the post-conviction petition [*See* Doc. 11-39]. The clock then ran until it expired on February 10, 2023; which is more than twenty (20) months before Petitioner filed his reply on or about October 17, 2024, raising new claims [*See* Doc. 18]. And the filing of Petitioner's initial Petition did not toll the statute of limitations. *See Duncan v. Walker*, 533 U.S. 167, 181-82 (2001). Accordingly, the new claims in Petitioner's reply are untimely. And it is not appropriate for the Court to address the merits.

**2. The Claims In The Reply Not Raised Before the TCCA Are Also Procedurally Defaulted.**

In addition, the claims in the Reply that Petition did not raise before the TCCA are procedurally defaulted. To exhaust his claims, Petitioner must have presented "the same claim under the same theory" in the state court. *See Pillette*, 824 F.2d at 497; *see also Wagner*, 581 F.3d at 418. Here, Petitioner procedurally defaulted all the claims in his Reply that he did not raise before the TCCA [*See* Doc. 11-29]. And to the extent Petitioner blames appellate counsel for the procedural default, Petitioner procedurally defaulted any claim for ineffective assistance of appellate counsel by not first exhausting that claim with the TCCA. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) ("an ineffective-assistance-of counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"). And the Supreme Court has expressly declined to extend the *Martinez* exception to claims of ineffective assistance of appellate counsel. *See Davila v. Davis*, 582 U.S. 521, 524-25 (2017). Accordingly, Petitioner also

procedurally defaulted the new claims raised in his Reply but not raised to the TCCA, and the Court separately denies these claims[6] on that basis too.

**B. No Claim In The Petition Establishes A Basis For Relief.**

Moving to the timely Petition, each claim in the Petition is based on alleged ineffective assistance of counsel [*See* Doc. 1 at 4]. To prove ineffective assistance of counsel, Petitioner must show: (1) constitutionally deficient performance by counsel, and (2) actual prejudice as a result of such ineffective assistance. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id*. at 687-88. The Court presumes that counsel's actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id*.

If counsel's performance was constitutionally deficient, at the prejudice stage, the Court "asks whether it is 'reasonably likely' the result would have been different" if counsel's performance had not been deficient. *Richter*, 562 U.S. at 111 (quoting *Strickland*, 466 U.S. at 696). "The likelihood of a different result must be substantial, not just conceivable." *Id*. at 112. Merely showing that "a court can[not] be certain counsel's performance had no effect on the outcome" or that "it is possible a reasonable doubt might have been established if counsel acted differently" is insufficient to establish prejudice. *Id*. at 111.

The issue for this Court now is not whether the *Strickland* standard is met but whether the state-court's decision that *Strickland* was not met warrants relief under AEDPA's standards. *Id*.

---

[6] Any "miscarriage of justice" claim "is not a freestanding constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *See Herrera v. Collins*, 506 U.S. 390, 400 (1993).

at 105 ("When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). Accordingly, to obtain federal relief, when a state court has rejected a *Strickland* claim on the merits, a petitioner "must demonstrate that it was necessarily unreasonable" for the state court to rule that way. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).

**1. No Relief Is Warranted Based On Trial Counsel's Alleged Failure To Prepare For Trial.**

Taking Petitioner's arguments in the order previously identified, no relief is warranted based on trial counsel's alleged failure to prepare for trial. Petitioner argues that trial counsel was constitutionally ineffective because he (1) "could have moved for [Petitioner's] [] confession to be suppressed in its entirety" based on Petitioner's allegation that he was "physically assaulted by the Hamilton County police at or around the time he made his [] confession" and (2) "made no effort to litigate cell phone records indicating Petitioner was not at the crime scene" [*See* Doc. 1-1 at 7].

In his post-conviction appeal, Petitioner raised this issue in the context of trial counsel's failure to seek a continuance "'the moment it [became] clear' that trial counsel was not prepared for trial." *Moore II*, 2021 WL 4705190, at *17. Applying *Strickland*'s two-prong test, the TCCA determined that Petitioner did not produce evidence to support his allegation of physical abuse by law enforcement and he was not prejudiced by trial counsel's failure to review the cell phone records. *Id.* at *17-*18. The court reasoned:

> The Petitioner claims that he received the ineffective assistance of counsel because trial counsel failed to file a motion for a continuance "the moment it [became] clear" that trial counsel was not prepared for trial. The Petitioner contends that if trial counsel had filed the motion earlier, rather than the day before trial, trial counsel could have investigated why the audio recording of the Petitioner's confession was incomplete and would have learned that the police had assaulted him during his interrogation. In support of his claim, the Petitioner asserts that his medical records and booking photograph "clearly" show that his left eye was swollen.

> During the initial evidentiary hearing, trial counsel testified that the Petitioner never told him before or during the suppression hearing that the police had beaten the Petitioner at the Police Service Center. Moreover, the evidence established that trial counsel received the Petitioner's audio-recorded confession more than two months before trial. In any event, the post-conviction court found that the Petitioner's testimony about being beaten was not credible and that his medical form and photographs did not "confirm" any injuries. We have reviewed the medical form and the photographs. Although most of the handwriting on the medical form was indecipherable and the Petitioner denied writing on the form, the following was written neatly on the right side of the document: "Eval inmate & altercation believe[d] to be from CPD! Right wrist to hand discomfort. Swelling to left eye!" The photographs taken by Officer Burnett after the Petitioner's interrogation, though, did not show any injuries. While the Petitioner's booking photograph showed a dark area below his left eye, his eye was not bruised or swollen. Therefore, we conclude that the post-conviction court did not err by denying relief on this issue.
>
> The Petitioner also contends that trial counsel's filing a "timely" motion for a continuance would have allowed trial counsel to investigate Investigator Wenger's claim that the Petitioner's cellular telephone records put the Petitioner at the scene of the crimes. The Petitioner asserts that had trial counsel reviewed the records, trial counsel would have discovered that the records were "simply incompatible" with the State's theory of the case.
>
> We have reviewed the trial transcript. Mr. Westfield testified that he had "no idea" what time he and the victim heard the knock on the victim's door but estimated that they heard the knock "[m]aybe 11:30 or so." Investigator Wenger testified that the crimes occurred "just before" or "just after" midnight and acknowledged that the police department received three 911 calls at 12:03 a.m. from witnesses who heard gunshots. Therefore, the evidence does not preponderate against the post-conviction court's finding that the crimes more likely occurred closer to 12:03 a.m. than 11:30 p.m. The evidence at the second evidentiary hearing established that the Petitioner's cellular telephone was just one and one-half miles from the crime scene at 12:08 a.m., and Mr. Hamilton testified that the location of the Petitioner's telephone at 12:08 a.m. was consistent with someone leaving the British Woods Apartments. Accordingly, we agree with the post-conviction court's conclusion that trial counsel's failure to review the records did not change the outcome of trial.

*Id.* For the reasons below, the TCCA's decision rejecting this claim was not an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts in light of the evidence in the record.

#### a). Allegation of physical assault

Factually, at his post-conviction hearing, Petitioner testified that when he was arrested, he was taken to the police station and "handcuffed to a bench" [Doc. 11-23 at 12]. Petitioner testified that the "first thing" Detective Wenger did was to begin "punching [Petitioner], telling [him] that [he was] going to tell him the truth, per se" [*Id.* at 13]. Petitioner testified that he initially fought back, with Detective Wenger giving him "mostly body shots" but at some point hitting Petitioner in his left eye [*Id.*]. Petitioner also claimed that a patrolman "joined in as well[,]" and that "this carried on for maybe two and [one] half, maybe three hours, of . . . double teaming, tag teaming" [*Id.* at 14-15]. Petitioner testified that Detective Wenger would "come in and out of the room," but he would not talk to Petitioner about the case; instead, "he was just telling [Petitioner] that [he] was a murderer" [*Id*. at 15]. Petitioner testified that he "never knew that [he] was being interrogated[] because [he] was never in an interview room" [*Id.*]. Petitioner stated that he was "never Mirandized[,]" "[t]here was no interview," and he never saw a recording device [*Id.* at 17].

Petitioner also testified that he was booked into the Hamilton County Jail after these interactions, and that "intake Officer Daniels . . . called medical down to, [ ] give [him] - [a] look over - a physical right then and there" [*Id.* at 36, 37]. Petitioner also stated that he "[had] complaints of [his] wrist" and "left eye" [*Id.* at 37]. At trial, Petitioner was presented with a document which he identified as "an evaluation once [he] was brought in" [Doc. 11-23 at 37; Doc. 11-25 at 58]. Petitioner testified that the document stated, "Evaluated inmate, a laceration believe to be from CPD, right wrist to hand. Discomfort, swelling to left eye" [Doc. 11-23 at 38]. Petitioner testified that he "let [trial counsel] know prior about that, but [counsel] never . . . contacted the jail or anything" [*Id.*].

On cross-examination, Petitioner testified that he "did not write" the statement on the document "Evaluated inmate, a laceration believe to be from CPD, right wrist to hand. Discomfort

to left eye," even though the statement was written in handwriting that was different from the rest of the evaluation [*Id.* at 96]. Petitioner was then handed a collection of photographs which he identified as the photographs taken by Detective Burnette after Petitioner's alleged beating [Doc. 11-23 at 100-01; Doc. 11-25 at 59-77]. Petitioner stated that the photographs were taken "before the actual altercation" [Doc. 11-23 at 104]. Petitioner confirmed that he testified at a pretrial hearing on the motion to suppress his statement but he "never mentioned anything about a beating" because he was "only answering the question that was asked to [him]" [*Id.*]. Petitioner testified that trial counsel "knew about it [the alleged beating]" and told Petitioner that "no one would believe [him]" [*Id.*].

On redirect examination, post-conviction counsel gave Petitioner a photograph he identified as his "booking picture" [Doc. 11-23 at 111; Doc. 11-25 at 77]. Petitioner testified that this photograph was taken after the alleged beating [*Id.* at 111]. Petitioner testified that there was "a dark bruise" under his left eye in the photograph [*Id.*]. Petitioner confirmed post-conviction counsel's assertions that, "as a black man, . . . bruises or whatever [don't] always show up that clearly," and that "[s]ometimes, it's harder to see than otherwise would be if you had different skin pigmentation" [*Id.* at 112]. Petitioner testified that "[s]ometime[s], it can take an hour, sometime[s] it could take days" for an injury to become visible [*Id.*]. He again testified that he had told trial counsel about this alleged altercation and that trial counsel's "exact words" were "he don't [sic] want to upset anybody" [*Id.* at 114-15].

Trial counsel testified that he filed a motion to suppress Petitioner's confession under "a *Ferguson*[7] theory" because there was not "a full complete recording copy" of Petitioner's confession [Doc. 11-24 at 6-7]. Trial counsel stated that the "master case file" did not contain the

[7] In *State v. Ferguson*, the Tennessee Supreme Court adopted a balancing test to determine when the State's failure to preserve evidence deprives a defendant of the fundamental right to a fair trial. *See* 2 S.W.3d 912, 917 (Tenn. 1999).

audio recording of Petitioner's statements and trial counsel "could tell from the written discovery that there [were] problems with Detective Wenger's tape recorder" [*Id.* at 7]. Trial counsel recalled that he had "sent emails to [the District Attorney's] office requesting that audio recording, but there were some problems getting that for quite a while" [*Id.*]. Trial counsel confirmed that he received a copy of the audio recording of the statement prior to trial and believed this occurred "somewhere within one to three weeks" before trial [*Id.* at 8]. Trial counsel was then given a copy of the "motion to reopen proof and reconsider [Petitioner's] motion to suppress statements and admissions," which was filed on June 17, 2013, wherein trial counsel stated that he was provided a copy of Petitioner's statements on April 8, 2013 [*Id.* at 8-9].

Trial counsel testified that he had an opportunity to review Petitioner's recorded confession statement and that he "tried to" give Petitioner the opportunity to review them, but Petitioner did not want to listen to the available portions because "he remembered what he said" [*Id.* at 10-11]. Trial counsel testified that Petitioner said he was "on the bench for some period of time" during his initial arrest and questioning, but Petitioner did not tell trial counsel "what, if anything, happened to him while he was on the bench handcuffed" [*Id.* at 15]. Trial counsel testified that he did not recall Petitioner mentioning any allegation of assault at any point during their preparation for the pretrial motion to suppress hearing [*Id.* at 17]. Trial counsel testified that Petitioner "brought that up during the trial" for the first time "[w]hen they played the statements that [Petitioner] gave to [Detective] Wenger" [*Id.* at 16-17]. Trial counsel recalled that "there were gaps in the recording, [and Petitioner] said that that was when they were beating him" [*Id.* at 16].

On cross-examination, trial counsel affirmed that he did not explicitly ask Petitioner whether "they" were hitting him or "doing anything to make [Petitioner] say all this stuff" [*Id.* at 37]. Trial counsel testified that he did not explicitly ask that question because, during his conversation with Petitioner surrounding "how his confession would have to be voluntary[,]"

Petitioner "brought up that he was in Special Ed early on and might not have understood what was going on" but "nothing about beatings came up" [*Id.* at 37-38]. Trial counsel testified, "I would think that if we were talking about voluntariness, that would have probably been something he would have wanted to tell me at that time" [*Id.* at 38].

Officer Kenneth Burnette testified that he was instructed to process Petitioner into custody on July 10, 2010 [Doc. 11-23 at 163]. Officer Burnette testified that he took photographs of Petitioner on that date and confirmed that the photographs previously admitted were taken by him [*Id.* at 164-65]. Officer Burnette testified that he memorialized what was done in a follow-up investigative report [*Id.* at 165]. He indicated that Petitioner was processed at 4:40 a.m. [*Id.*]. On cross-examination, postconviction counsel asked Officer Burnette about his familiarity with bruises but did not specifically ask Officer Burnette whether he observed any bruise on Petitioner at the time he took the photographs [*Id.* at 168].

The post-conviction court concluded that trial counsel's performance was not deficient:

> [T]he petitioner's testimony on this issue comes too late to be credible. The petitioner did not complain during the interrogation to other officers who were coming and going. Although the medical records mention an incidental complaint to a health care provider a few days later, neither the medical records nor the photographs confirm any injury to the petitioner. The petitioner did not complain to counsel, before trial, despite a motion to suppress the confession and a hearing on the motion and advice from counsel that the admissibility of the confession was dependent on its voluntariness.

[Doc. 11-22 at 127].

This decision does not warrant relief under AEDPA. The TCCA could reasonably conclude that under *Strickland*, Petitioner did not show that trial counsel was ineffective. Petitioner failed to show that his confession statement could have been suppressed if trial counsel presented evidence of an alleged beating at the hearing on the pretrial motion to suppress. As counsel stated at the post-conviction hearing, and the court credited, Petitioner did not inform trial

counsel of any alleged assault during their pretrial discussions. Notably, Petitioner did not mention the alleged beating during discussions surrounding the motion to suppress Petitioner's confession where trial counsel made clear that the voluntariness of the confession was at issue. And the photographs that Petitioner identified during the post-conviction hearing did not show that any alleged beating occurred. Even the alleged "booking picture" was inconclusive. And the handwritten statement on the evaluation form regarding an altercation with "CPD" appears to be in a materially different handwriting than the rest of the evaluation form, leading to an obvious gap regarding who wrote that statement and when it was added to the form. Petitioner denied that he wrote the statement, but even under his theory, there was no evidence regarding who wrote the statement and when. And there was not sufficient corroborating evidence of an injury consistent with an alleged beating lasting hours. Trial counsel cannot be deemed ineffective for failing to make an argument that would have been futile. *See Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2003).

**b). Cell phone records**

Moving to the cell phone records, in the initial post-conviction proceedings, Petitioner identified certain documents as his cell phone records [Docs. 11-23 at 21-22; 11-25 at 9-30]. Petitioner stated that "according to Timothy Westfield and [he] guess[ed] police reports that [he'd] read," the attempted robbery and homicide "took place at 11:30[]" at "4417 Oakwood Drive"—the "British Woods Apartments" [Doc. 11-23 at 24-25, 26]. Based on the cell phone records, Petitioner testified that on the day of the shooting, he made a phone call at "23:40" and the address identified was "2338 McCallie Avenue" [*Id.* at 23-24]. Petitioner also testified that the records showed that he placed a call at "23:39" from "1521 Riverdale Drive" [*Id.* at 24].

Petitioner testified that the distance between McCallie Avenue and Oakwood Drive was "about ten and [one] half miles[,]" and "[g]oing the speed limit," it would take "probably 20, 25

minutes" to get from McCallie to Oakwood or vice versa [*Id.* at 25]. Petitioner also testified that Riverdale Drive "is farther away" and it would take "[a]t least 30 minutes" to get from Riverdale Drive to Oakwood Drive or vice versa [*Id.* at 26]. Petitioner assessed that "[Detective Wenger] was lying. There's no way in the world he can put" Petitioner at the crime scene [*Id.* at 28]. Petitioner testified that neither trial counsel nor his private investigator "sa[id] anything about phone records" [*Id.* at 41-42].

Trial counsel testified that he did not remember going over Petitioner's cell phone records. [Doc. 11-24 at 43]. Trial counsel testified that he did not recall seeing Petitioner's cell phone records before, even once presented with records [*Id.* at 44]. While looking at the cell phone records, trial counsel testified that handwritten notes on the records indicate that "[a]round 23:40[]" Petitioner's phone registered the location of "2338 McCallie Avenue" [*Id.*]. Trial counsel testified that he grew up "[c]lose by" to Chattanooga, and estimated that it would take "15 minutes, maybe" to drive from McCallie to Oakwood [*Id.* at 45]. Trial counsel reviewed a portion of Westfield's trial testimony on cross-examination to refresh his recollection then testified that Westfield indicated "[t]hat he gets a knock on the door about 10:45 or 11" [*Id.* at 46]. Trial counsel continued to read from the trial transcript and indicated that Westfield testified "that it might have been 11:30 or so" [*Id.*]. Referring back to the cell phone records, trial counsel testified that "[i]t would be very difficult" for Petitioner to travel from McCallie Avenue to Oakwood Drive in ten (10) minutes [*Id.* at 47]. Trial counsel confirmed that he "diligently looked through discovery looking for defenses" but that he did not remember seeing the cell phone records before [*Id.*].

On redirect examination, trial counsel testified that the addresses listed on Petitioner's cell phone records "possibly [represented] the cell tower," rather than Petitioner's physical location at the relevant time [*Id.* at 77]. Trial counsel testified that, based on his experience with cell phone records, it "[does] not necessarily" mean that that individual is at the listed address, but is rather

"very close to [it], theoretically" [*Id.* at 78]. Trial counsel agreed that it would be "inconsistent" with the record if a witness testified that Petitioner was at "12th Avenue on the night" because 12th Avenue is a "[p]retty good distance" away from McCallie [*Id.* at 78].

A private investigator, Terry Glen Buckley, testified as an expert witness on behalf of Petitioner [Doc. 11-26 at 5-8]. Buckley testified that he had the opportunity to review cell phone records "provided by counsel, on two different occasions, . . . some older records and then some, later on, newer records" [*Id.* at 8]. Buckley testified that the records admitted into evidence are called "call detail records" and that the information is "some switch information" [*Id.* at 10]. Buckley defined "switch information" to include "[t]he call, date, and time, the originating cell phone tower, the terminating cell phone tower, the face of the tower, . . . [t]he number that was dialed . . . , [and] the number that was called" [*Id.*].

Buckley testified that, from the admitted cell phone records, one cannot determine where the cell phone was located, because those records did not contain "the latitude and longitude location for the corresponding cell tower number" [*Id.* at 10-11]. He testified that, in his expert opinion, "cell phone location data is circumstantial" [*Id.* at 11]. Buckley explained that the location is "approximate" because "[t]here's a certain margin, certain radius, depending on the terrain, the tower strength, [and] the signal" [*Id.* at 12]. He testified that "a common misconception is people think that a cell phone is going to communicate with the tower that's closest to it" [*Id.*]. That is "typically the case," but "a cell phone is going to . . . communicate with the tower that it's getting the strongest signal from. That doesn't always translate to the closest one" [*Id.*].

Prior to his testimony, Buckley reviewed a black and white copy of Petitioner's cell phone records and rendered an opinion in an affidavit, which was not entered into evidence [*Id.* at 9, 14]. Buckley testified that the "only [cell towers] that [he] was able to map, again, due to not having the switch information, the tower location data, from the service provider[]" were the towers

"where the investigator or examiner at the time had handwritten on these documents" the "tower number and then an actual physical address" [*Id.* at 14]. Buckley concluded:

> [B]ased on the map and the towers that I was able to map, based on what was written on here, it appeared to me that there were towers that were closer to the crime scene, which again does not necessarily mean that the phone should or should not have communicated with those towers, but given the time of day and the terrain in between the crime scene and the other cell phone towers, it seemed probable to me that that cell phone should have been communicating with the towers that were closer to it.

[*Id.* at 15-16].

In preparation for his testimony at the rehearing, Buckley reviewed an "updated version of . . . the map of the area" provided by Tennessee's expert [Docs. 11-26 at 18; 11-27 at 22]. Based on this map, Buckley testified that, if the crime occurred around 11:30 p.m., "[he] [did] not believe that the [Petitioner's cell phone] was near the crime scene at that time" [Doc. 11-26 at 23]. Buckley confirmed that the map indicated that "at 12:08 p.m.," Petitioner's phone communicated with a tower "close to the location of the crime" [*Id.* at 24]. The "face of the tower is actually pointed away from the crime scene" [*Id.*]. Buckley measured the distance between the crime scene and the tower, estimating the distance at "approximately one and a half miles" [*Id.* at 25].

On cross-examination, Buckley testified that he utilized the black and white records to generate his own map using Google Earth Pro, which was admitted [Doc. 11-26 at 35; Doc. 11-25 at 23]. He did not know whether he was given cell phone records from service provider Verizon or Cricket, but he plotted Cricket cell phone towers because the "plots that the investigator had made previously" said Cricket [Doc. 11-26 at 38]. Buckley testified that he could not determine which service provider the numbered towers on the map belonged to because he "did not have the cover sheet that came with the records that would" identify the service provider [*Id.* at 41].

The State provided Buckley a copy of the incident report from the crime, which he reviewed and then stated that the document indicated that officers were dispatched to the British

Wood Apartments at 12:03 a.m. [*Id.* at 43]. Buckley testified that, five (5) minutes later, Petitioner's device communicated with a tower "approximately one and a half miles" away from the crime scene [*Id.*]. Buckley "recall[ed] seeing multiple alibi locations that were pinned on the map by the State's expert[,]" but he could not testify about whether the data points were consistent with Petitioner's alibi before and after trial without seeing "the other maps" [*Id.* at 47-49].

Mark Hamilton, a technical forensic with the Chattanooga Police Department, testified as an expert witness on behalf of the State [*Id*. at 57, 60]. Hamilton generated maps based on the data from Petitioner's cell phone records [*Id.* at 61-62]. Hamilton testified that he also reviewed information about when law enforcement was dispatched to the scene [*Id.* at 63]. Hamilton was able to discern that Petitioner's cell phone records were from Verizon, but he also reviewed "several pages" of Cricket records and Cricket maps [*Id*. at 64]. Hamilton testified that he had "never seen" a Verizon device communicate with a Cricket cell tower and Verizon "certainly would not share with a competitor" [*Id.* at 65].

From the cell phone record data, Hamilton could not assess exactly where the individual with the device was just by determining which sector of a tower the device communicated with [*Id.* at 68]. But when the device connected to one tower at 11:39 p.m. and then connected to a different tower at 11:40 p.m., "[his] assumption would be that he moved, even could be a little bit or a lot, but he moved where he's hitting a new tower" [*Id.*]. The movement "would probably be to the east" [*Id.*]. Hamilton testified that at 12:08 a.m., Petitioner's device connected to the face of the tower "facing the east/southeast[,]" and that "looking at mileage and time from Oakwood to the apex of that tower," this data could be consistent with someone leaving the crime scene and going through the Washington Hills area [*Id.* at 71].

Hamilton also testified that he reviewed some of Petitioner's alibis [*Id.* at 72]. Speaking to Petitioner's "original alibi" from 2013 that he was "in an area called Deep Drive, or at an address

located at Deep Drive, from 7 p.m. 6/28/2010 to 7 a.m. 6/29/2010," Hamilton testified that he was "unable to locate any Deep Drive in Chattanooga" and the zip code Petitioner provided was not consistent with the cell phone record location [*See id.* at 72]. Hamilton also compared Petitioner's post-trial alibi that he was at "a 12th Avenue address[] between 11:10 p.m. and 1:10 a.m." and stated that the second alibi would not be consistent with the cell phone records [*Id.* at 73]. Finally, Hamilton compared Petitioner's third alibi that he was "at a residence on 12th Avenue from 8 p.m. till 11:50 p.m." and "then went to Brainerd Road to eat and then to a house" [*Id.* at 73-74]. Hamilton testified that this alibi, too, was not consistent with the cell phone records [*Id*. at 74].

On cross-examination, Hamilton explained that the cell phone records were inconsistent with Petitioner's original "Deep Drive" alibi because "the zip code . . . was inconsistent with towers that are up in the Harriet Tubman and Highway 58" [*Id*. at 79]. Hamilton agreed that the tower Petitioner's device was communicating with was "relatively near that area," but Hamilton testified that "[t]he alibi is to the east and . . . there's no record showing the use of the sector facing east" [*Id*. at 80]. Hamilton explained that the location of a device will be "on the side of the sector facing the angle," and specifically testified that " [tower] 898 would be consistent with north or to the west . . . [and] there's no sector field to the east" [*Id.*]. Hamilton more thoroughly explained that "[the] alibi said [Petitioner] stayed, and he definitely didn't. That device moved . . . all over that side of town" [*Id*. at 81]. Hamilton testified that in Chattanooga, there is a ridge that "completely divides the city down the middle, on radio waves, because they don't go through dirt" [*Id.*]. Hamilton continued, "if the tower is in the valley, you're not going to hit it when you're on the other side of that ridge" [*Id.*]. This terrain information was important to the determination that the records were inconsistent with Petitioner's original alibi because the device was not stationary; rather, the "mobile device [was] moving all over the place and back and forth across that ridge

line. You can't hit those other towers from the other side of that ridge because it's a tall ridge and it's got a lot of rock in it" [*Id.* at 82].

Post-conviction counsel questioned Hamilton on whether the cell phone records would be consistent with Westfield's testimony that the attempted robbery and deadly shooting occurred around 11:30 p.m., despite the incident report reflecting officers were dispatched at 12:03 a.m. [*Id.* at 83-84]. Hamilton testified:

> [T]here's a statement that they were in Boone Heights at that time and drove over to Highway 58. And that's what's consistent with those records. In the 11:40, they're moving, plenty of time to get to Highway 58, to Oakwood, and plenty of time to get from the shooting scene to that side of that tower on Bonny Oaks. There was more than enough time to leave that scene.

[*Id.* at 85]. Hamilton also testified that, for the "11:30 time frame," the device was "[a]ll over the place" [*Id.* at 86]. Framing the question as a hypothetical, post-conviction counsel asked Hamilton if "there is any indication, based on that report, of [Petitioner's] cell phone pinging at 11:30, of being in [the crime scene] area around 11:30" [*Id.* at 88]. Hamilton responded that "there's indications that it's not in that area at 11:30" [*Id.*].

Upon hearing testimony from both expert witnesses, trial counsel, and Petitioner, the post-conviction court held that Petitioner had not shown there was a reasonable probability that the outcome of his trial would have been different had counsel used Petitioner's cell phone records at trial [Doc. 11-22 at 129]. The court reasoned that, although the post-midnight time of dispatch was not admitted into evidence at trial, "had counsel tried to use the petitioner's cell-phone records as an alibi, the state would have made a point to prove the time of dispatch" [*Id.*]. Further, it concluded that Petitioner had not sufficiently proven prejudice because "the petitioner's confession was in evidence at trial, [and] had counsel tried to use the petitioner's cell-phone records as an alibi, the consistency of those records with his confession would have strengthened the prosecution's case" [*Id.*].

Here, too, this decision does not warrant relief under AEDPA. The TCCA could reasonably conclude that under *Strickland*, Petitioner did not show prejudice. Contrary to Petitioner's assertion that "[t]hese records were highly exculpatory and would have exonerated" him if presented, [*see* Doc. 1-1 at 7], the testimony at the post-conviction hearings allowed the TCAA to reasonably conclude that the cell phone records were inculpatory, not exculpatory. Both Petitioner's expert witness and the State's expert witness determined that Petitioner's cell phone records indicated his device was approximately 1.5 miles away from the crime scene just five (5) minutes after law enforcement was dispatched to crime scene. Moreover, at trial, Westfield did not testify with certainty that the attempted robbery and deadly shooting occurred at 11:30 p.m. Rather, Westfield testified that he "[had] no idea what time it was" when there was a knock at the victim's door [Doc. 11-5 at 48]. Westfield testified that he arrived at the victim's residence at "10:45/11 p.m." [*Id.*]. And there was a knock at the door "[not] long after we had been there [*Id.*]. Hamilton testified that the cell phone records were not consistent with any of the alibis Petitioner offered [Doc. 11-26 at 72-74]. And although trial counsel testified that he did not recall seeing these records in the master case file, Petitioner has not shown that had trial counsel raised the cell phone records at trial, the outcome of the trial would have been better. In fact, opening the door to the cell phone records may have made matters worse for Petitioner. This is especially true in light of Petitioner's alibi, which was inconsistent with the phone records, and his detailed confession, involving knowledge of the crime scene and crime itself.

**2. No Relief Is Warranted Based On Trial Counsel's Failure to Present Witness Testimony Regarding The Black Facial Wrap.**

Here, no relief is warranted based on trial counsel's failure to present witness testimony regarding how Petitioner's DNA came to be on a black facial wrap found in the alleged getaway vehicle. Petitioner asserts that trial counsel was constitutionally ineffective in failing to "present

witness testimony showing that" the black facial wrap with Petitioner's DNA on it was an item he used regularly "to protect his allergies" while "cut[ting] grass for a local church" [Doc. 1-1 at 7, 8]. Petitioner raised this same argument on post-conviction appeal. *Moore II*, 2021 WL 4705190, at *18. Applying *Strickland*'s two-prong test, the TCCA determined that Petitioner had not shown prejudice. *Id.* It reasoned:

> The Petitioner claims that he received the ineffective assistance of counsel because trial counsel failed to call witnesses to testify that the Petitioner regularly wore a black facial wrap to mow grass at the church. He contends that he was prejudiced by trial counsel's failure to present the testimony because the State's theory was that he used the black facial wrap and a blue mask to cover his face during the crimes; therefore, the testimony would have explained why his DNA was on the wrap and why the wrap was in Ms. Angel's car. We note that the church pastor did not testify at the evidentiary hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (providing that this court may not speculate as to the content of a witness's testimony). Ms. Thompson testified at the hearing that the Petitioner regularly wore the wrap to mow grass, and trial counsel stated that Ms. Thompson could have testified to that fact at trial. The post-conviction court found, though, that the Petitioner was not prejudiced by trial counsel's failure to present her testimony because a codefendant could have been wearing the black facial wrap with the blue bandana at the time of the crimes. We agree with the post-conviction court. Mr. Westfield testified at trial that one of his assailants was wearing a half-mask; that he saw two colors, black and teal blue; and that the blue color was either on the assailant's "doo rag" or on the assailant's mask. A teal blue bandana was found with the black facial wrap in Ms. Angel's car. The Appellant told law enforcement that he waited in the car during the attempted robbery. Therefore, the Petitioner has failed to demonstrate that he was prejudiced by trial counsel's not presenting Ms. Thompson's testimony at trial.

*Id.*

At the post-conviction hearing, Petitioner testified that at the time of the crime, he "was a landscaper for New England Baptist Church" [Doc. 11-23 at 9]. Petitioner testified that he purchased a wrap-around facial wrap "to protect [his] mouth and [his] face" from rocks while weed eating [*Id.* at 9-10]. On cross-examination, Petitioner testified that he was aware that trial counsel talked to the pastor of the church regarding this assertion [*Id.* at 74].

At the hearing, Petitioner's mother, Annette Thompson, testified that the morning after the crimes, she "watch[ed]" Petitioner cut grass at New England Baptist Church [*Id.* at 157]. She testified that when Petitioner cuts the grass, "[he] wears a black mask" because "he was diagnosed with asthma and . . . he don't want stuff all over him" [*Id.*]. She testified that trial counsel told her "and the preacher" that they were needed for trial, and both waited "about three hours" before trial counsel "told [them] he didn't need [them] anymore" [*Id.* at 158].

Trial counsel testified that he "filed a motion to exclude the blue bandana and face mask" "found in the back of [Petitioner's] girlfriend's car that he [Petitioner] was driving when he was arrested" [Doc.11-24 at 18-19]. Trial counsel explained that he attempted to exclude these items because he "didn't think they would be relevant," he believed "the State's theory would be that [Petitioner] was the driver of the car," and trial counsel did not recall "any bandana or face mask on the other individuals, and so [he] thought it would be unfairly prejudicial" [*Id.* at 19].

Trial counsel also testified that Petitioner had made counsel aware that Pastor Peter Ballard was an alibi witnesses, and counsel intended to call Pastor Ballard at trial [*Id.* at 24]. Trial counsel testified that he spoke with Pastor Ballard and recalled the substance of his testimony to be: "he remembered [Petitioner] and that he in fact did mow grass at the church" [*Id*. at 25]. Trial counsel stated that he wanted Pastor Ballard to "substantiate why [Petitioner] had the facial wrap," but the pastor did not feel comfortable being an alibi witness "because he couldn't confirm" that Petitioner "was there the morning . . . this happened" [*Id.* at 25, 26].

Trial counsel testified that he decided not to call Pastor Ballard because Pastor Ballard "was very uncomfortable," and trial counsel did not want to "put[] him in a situation where he may be thinking that we were wanting him to say something he wouldn't feel comfortable saying" [*Id.* at 27]. Trial counsel stated that he discussed this decision with co-counsel but did not recall discussing it with Petitioner [*Id.*]. On cross-examination, trial counsel testified that he could have

called Pastor Ballard to testify for only the "express purpose" of stating that Petitioner "was indeed wearing a black facial wrap when he worked at the church" [*Id.* at 64]. Petitioner did not call Pastor Ballard at the evidentiary hearing.

After considering the evidence presented, the post-conviction court determined that, "[e]ven if the petitioner did wear the wrap to minimize his exposure to allergens while working, it was possible that a co-defendant was wearing it with a blue bandana during the offenses" [Doc. 11-22 at 129]. The court found "no prejudice in counsel's performance" because "petitioner's statement to police was so much more unfavorable as to render the omission of the evidence" at issue "inconsequential" [*Id.* at 130].

This decision, too, does not entitle Petitioner to relief under AEDPA. The TCCA could reasonably conclude that under *Strickland*, Petitioner did not show prejudice. Trial counsel reasonably explored the evidence that Thompson and Pastor Ballard could supply at trial. They could testify that Petitioner mowed the grass at New England Baptist Church and wore a black facial wrap to do so at least one time. But Petitioner has not shown that this evidence, if elicited, likely would have led to a different outcome at trial. Petitioner confessed that he was in "the back of the apartments in a gold[-]colored car" while the crimes were committed [Doc. 11-9 at 95]. Petitioner also told law enforcement that his "girl's" car was a "gold Maxima" [*Id.* at 66]. And Westfield indicated that a "gold car pulled up right in front" of the apartment while he was tending to the victim after the shooting [Doc. 11-8 at 41]. A Tennessee Bureau of Investigation DNA report indicated that a black facial wrap was collected from a Nissan Maxima [*Id.* at 21]. Petitioner's DNA sample was a match to the DNA collected from the wrap [*Id.* at 23]. How, precisely, the DNA matching Petitioner got onto the wrap was inconsequential in context of the evidence linking him to the apartments that were the scene of the crime, on the night of the crime, in a gold Maxima matching the vehicle that pulled up shortly after the victim was attacked.

### 3. No Relief Is Warranted Based On Trial Counsel's Failure To Present Alleged Alibi Witnesses.

No relief is warranted based on trial counsel's failure to call alleged "alibi" witnesses either. Petitioner argues that trial counsel was ineffective in failing to "present alibi witness testimony" that allegedly "confirm[ed] that the Petitioner was not at the crime scene during the time of the alleged offense" [Doc. 1-1 at 8]. Petitioner argues that "there were multiple witnesses who trial counsel could have called to refute the Petitioner's alleged admission that he was present at the crime" scene [*Id.*]. The Petition does not specify who Petitioner believes trial counsel failed to call who likely would have made a difference. But Petitioner raised this claim on post-conviction appeal as it relates to Hudson and Buckley. *See Moore II*, 2021 WL 4705190, at *19. The TCCA rejected the argument. It stated:

> The Petitioner claims that he received the ineffective assistance of counsel because trial counsel failed to present testimony from Mr. Hudson and Mr. Buckley to establish an alibi for the Petitioner. Trial counsel testified that the Petitioner never told him about Mr. Hudson, and the post-conviction court found the Petitioner's alibi evidence not credible, stating that "[the Petitioner's] present alibi seems to be an attempt to be consistent with the phone records." Additionally, as we have already discussed, the Petitioner's cellular telephone records did not establish that the Petitioner was not at the crime scene. Therefore, the Petitioner also has failed to demonstrate that trial counsel was ineffective for not presenting testimony from Mr. Hudson and Mr. Buckley at trial.

*Id.*

Factually, at his post-conviction hearing, Petitioner testified that on the night of the crimes, he was "with [his] little brother," John Hudson, at his "old lady's [Octavia Rucker's] house on McCallie" [Doc. 11-23 at 8]. Sometime around 11:50 p.m. or 12:00 a.m., they left in Rucker's vehicle to get "a bite to eat on Brainerd Road" [*Id.*]. Afterwards, they dropped Hudson off and went to Rucker's house [*Id.*]. Petitioner testified that, at trial, trial counsel represented that "he was trying to find the ["alibi"] witnesses, when the whole time, . . . they w[ere] sitting outside" [*Id.* at 51]. The next morning, trial counsel purportedly told Petitioner that "the State did not put

on enough evidence to find [him] guilty, so, therefore, he's not going to call [Petitioner's] alibi or any other witnesses" [*Id.*].

On cross-examination, Petitioner testified that on the night of the crimes, he was with Hudson and Rucker in her Explorer [*Id.* at 67]. Petitioner confirmed that, at the time he was arrested, however, he was "together" with Angel [*Id.* at 68]. Petitioner testified that the statement Angel gave regarding his whereabouts on the night of the homicide—that Petitioner dropped her off at night school, left in her Maxima, and returned at 4:30 p.m. the next day—was "very much not true" [*See id.* at 69]. Petitioner stated that he was aware that trial counsel spoke with Rucker but was not aware if trial counsel spoke with Hudson [*Id.* at 74].

At the evidentiary hearing, Hudson testified that he was with Petitioner on the evening of the crimes [Doc. 11-23 at 139]. He testified that he was with his girlfriend when Petitioner called him, and that Petitioner "ended up coming to come visit" [*Id.*]. Hudson stated that they "chilled" and "talk[ed]" before leaving to get his stepdaughter and get food from Sonic [*Id.*]. He and Petitioner "parted ways after a couple of hours or so" [*Id.* at 140].

On cross-examination, Hudson testified that Petitioner called him twice, the first call was "around 10 something," and the second call was "after 11" [*Id.* at 142]. Hudson stated that he "gave [Petitioner] directions" to the house he was renting [*Id.*]. Hudson could not recall the address, but the house was on 12th Avenue [*Id.* at 143]. He did not know when Petitioner arrived at the house, but it was "roughly . . . around 11 something" [*Id.* at 144]. Hudson estimated Petitioner arrived "probably like ten minutes" after the second phone call took place [*Id.*]. Hudson stated that he introduced Petitioner to his then-girlfriend and stepdaughter [*Id.* at 144-45]. They went to Sonic, then came back to the house [*Id.* at 145]. Hudson estimated that the trip to and from Sonic took "about 45 minutes" and that Petitioner was at the 12th Avenue house for approximately two (2) hours after they returned [*Id.* at 146-47]. Hudson did not know where Petitioner went

afterward, but Petitioner left with "[s]ome" "girl" in a "truck, a four-door like an SUV" [*Id.* at 145, 147]. Hudson appeared to be confused when asked when he became aware that Petitioner was allegedly with him at the time of the homicide [*Id.* at 148-51]. However, Hudson ultimately testified that it was not until the evidentiary hearing that he realized that Petitioner was allegedly with him at the time of the homicide [*Id.* at 151].

On redirect examination, Hudson testified that he came forward "because at that alleged time, [Petitioner was] with [him], from what he said" [*Id.* at 161]. Rucker did not testify at the post-conviction evidentiary hearing [*See, generally*, Doc. 11-23; Doc. 11-24].

Trial counsel testified that prior to trial, he filed a notice of alibi listing Rucker as an alibi witness [Doc. 11-24 at 24; *see also* Doc. 11-1 at 106]. Rucker and Pastor Ballard were the only alibi witnesses of which trial counsel was made aware [*Id.* at 24-25]. Petitioner did not identify Hudson as an alibi witness [*Id.* at 25]. Trial counsel spoke with Rucker and believed that she was "on standby" for the trial [Id. at 27]. Trial counsel "got her" a subpoena but thought that "[s]he might have been working and sa[id] that she could come if needed" [*Id.* at 27-28]. Petitioner told trial counsel that Rucker "could substantiate that on the evening in question, he was at her residence" [*Id*. at 28].

But trial counsel recalled that Rucker told him she "would get dropped off at [night] school by [Petitioner], . . . and he would borrow her car. And that she couldn't be for certain that he dropped her off that night but that was a typical arrangement they had" [*Id.*]. Trial counsel stated that Rucker stated that "she was his [Petitioner's] girlfriend" and "that she could help substantiate his whereabouts on the night in question" [*Id.* at 29]. Ultimately, trial counsel decided not to call Rucker as a witness because (1) he worried her prior convictions made her "not credible," (2) Petitioner only mentioned her "two or three months[] before trial," and (3) the "storyline that she gave, nothing was concrete on it, so [he] just did not have a good feeling about calling her"

[*Id.*]. Trial counsel discussed this decision with co-counsel but did not recall whether he discussed the decision with Petitioner [*Id.* at 30].

After hearing the evidence, the post-conviction court determined that Petitioner's "present alibi is inconsistent in part with his original alibi" [Doc. 11-22 at 127].

> According to the petitioner's 10 May 2013 notice of alibi, a little before 7:00 p.m. on 28 June 2010, he collected his girlfriend Octavia Rucker from school in her vehicle, which he had borrowed to drive while she was in class, they spent the evening at and did not leave her residence, the following morning, she left him at church to mow grass starting at 7:00 a.m., and he planned to call Ms. Rucker and a pastor as alibi witnesses. According to the petitioner's brother's post-conviction testimony, the petitioner and a girlfriend arrived to visit him and his girlfriend about 11:10 p.m. and remained for about two hours. According to the petitioner's own post-conviction testimony, sometime after 8:00 p.m. he took Ms. Rucker to visit his little brother, which is where he was about 11:30 p.m., the time of the murder, went to eat on Brainerd Road about 11:50 p.m., and then went to a house.

[*Id.* at 127-28]. The post-conviction court credited "counsel's postconviction testimony that the petitioner, despite his awareness of the value of an alibi witness, did not identify his brother as an alibi witness" [*Id.* at 128]. The court also concluded that Petitioner's "present alibi seems to be an attempt to be consistent with the phone records" [*Id.*].

This decision, too, does not entitle Petitioner to relief under AEDPA. The TCCA could reasonably conclude that under *Strickland*, Petitioner did not show ineffective assistance of counsel. Presuming that Petitioner wishes to raise the claim that he actually exhausted before the TCCA, there is nothing about the testimony that Hudson or Buckley would have given that would warrant relief.[8] Start with Hudson. The TCCA found that trial counsel credibly testified that Petitioner did not inform counsel that he was with Hudson on the night of the crimes. Instead, the notice of alibi stated that Petitioner "picked up his girlfriend Octavia Rucker from her school a

---

[8] To the extent Petitioner wanted to raise an issue about failing to call a different "alibi" witness, he would have failed to exhaust that claim before the TCAA. And he presented no argument for this Court to excuse his failure to exhaust.

little before 7:00 p.m. in her vehicle that he borrowed to drive while she was in class" [Doc. 11-1 at 106]. And Petitioner "spent the evening at her residence on Deep Drive" and "did not leave her residence" [*Id.*]. Trial counsel was not deficient for failing to raise a second alibi of which he was not made aware and that was materially inconsistent with the initial alibi Petitioner espoused. And the TCCA reasonably determined that Petitioner's later Hudson-"alibi" was an attempt to work around the phone records, which showed his initial alibi to be inconsistent with the facts. Perhaps more important, Petitioner's confession at the time of his arrest is inconsistent with both alibis.

The same holds true for any testimony Buckley could have provided at trial. Remember that at the hearing Buckley would not, and could not, state that Petitioner's cell phone records were consistent with any of the alibis Petitioner offered pre- or post-trial [*See* Doc. 11-26 at 43-49].

**4. No Relief Is Warranted Based On Trial Counsel's Failure To File A Motion In Limine Regarding Evidence From Angel's Home.**

In addition, Petitioner is not entitled to relief based on trial counsel's failure to file a motion in limine to exclude evidence from Angel's home. Petitioner argue that counsel was ineffective in failing to "file a motion in limine in regard[] to the firearms, ammunition and bullet proof vests that had been found in the Petitioner's girlfriend's home prior to his arrest" [Doc. 1-1 at 8]. This evidence "combined with the previously referenced instances of ineffective assistance of counsel, was [allegedly] cumulatively prejudicial to" Petitioner [*Id.* at 9].

Petitioner raised a similar claim, without the assertion of cumulative prejudice, on post-conviction appeal [Doc. 11-29 at 38; Doc. 11-34 at 17]. *Moore II*, 2021 WL 4705190, at *19. So, only that more limited claim is exhausted.[9] Applying *Strickland*, the TCCA determined that trial counsel's failure was deficient but not prejudicial. *Id.* It stated:

> The Petitioner claims that he received the ineffective assistance of counsel because trial counsel failed to file a motion in limine to prevent the jury from hearing about

[9] Having reviewed the record, any cumulative prejudice theory would also fail here.

> a firearm, ammunition, and a bulletproof vest that were found in Ms. Angel's home. We disagree with the Petitioner.
>
> According to the trial transcript, Officer Burnett testified that he searched Ms. Angel's Fort Oglethorpe home and photographed and collected a bulletproof vest, a pistol, and two pistol magazines. The State introduced the photographs of the items into evidence without objection. The State then moved to introduce the vest into evidence, but trial counsel objected, arguing that the items were irrelevant because the State could not "link" them to the Petitioner. Trial counsel also requested that the trial court exclude the photographs. The State asserted that the items were relevant to show the police conducted a complete investigation, which trial counsel had attacked in his opening statement. The trial court allowed the photographs to remain in evidence because trial counsel had failed to object to them. Regarding the bulletproof vest, the trial court allowed the State to introduce the vest for identification purposes only and instructed the jurors that they could not consider the vest as evidence.
>
> The State asserts that trial counsel was not deficient because he objected and was "successful." However, trial counsel's objection to the evidence was too late to prevent the jury from hearing about the items and was too late to prevent the photographs of the items from being introduced into evidence. Therefore, we agree with the Petitioner that trial counsel was deficient. In any event, the State did not allege that the vest was related to the crimes, and the State did not attempt to introduce the pistol and magazines into evidence. Moreover, co-counsel reminded the jury during closing arguments that none of the items taken from Ms. Angel's apartment were connected to the Petitioner. Finally, given the Petitioner's confession and details about the crimes, we agree with the post-conviction court that he has failed to demonstrate prejudice. Accordingly, the Petitioner is not entitled to relief on this issue.

*Id.*

Factually, at his post-conviction hearing, Petitioner confirmed that a gun was introduced at trial and stated that one gun was "legally owned by [his] mother, which was behind two locked safes" [Doc. 11-23 at 49]. Petitioner testified that a second gun "was discovered in Georgia, along with a bulletproof vest, that also was not [his], but was shown to the jury as well" [*Id.*]. Petitioner stated that a third gun was shown to the jury, which was collected from his co-defendant's house, "but never nothing that [he] had or that was in [his] possession" [*Id.*]. Petitioner testified that he did not know what a motion in limine was and that he did not recall trial counsel ever discussing a motion in limine with him [*Id.*].

On cross-examination, Petitioner agreed that he was with Angel in her Nissan Maxima when he was arrested in July 2010 [*Id*. at 68]. Petitioner slept at Angel's residence in Fort Oglethorpe, Georgia "a few times" [*Id.* at 72]. Petitioner said that police searched Angel's home and recovered a bulletproof vest and a firearm, both of which belonged to Angel's brother [*Id.*]. Petitioner maintained that Angel's statement that the firearm recovered from her home was one Petitioner brought there after the homicide was "a lie" [*Id.* at 73]. Petitioner asserted that he did not have access to the gun, because Angel "was the one that opened the safe" [*Id.*]. Petitioner stated lab reports showed his fingerprints were not on the gun located at Angel's residence [*Id.*].

Trial counsel testified that he recalled objecting when the guns and bulletproof vest were brought up, but that he "didn't think those would be relevant to come in at all and didn't think there was really too much to worry about there" [Doc. 11-25 at 52-53]. Trial counsel agreed that he "probably should have brought that up earlier" and that he would "chalk it up to just inexperience" [*Id*. at 53].

After hearing the evidence, the post-conviction court noted that "even if there was evidence connecting the petitioner and the items in issue, that they were at his girlfriend's house, there was no evidence connecting the items in issue to the offenses" [Doc. 11-22 at 126]. The court found "no prejudice in counsel's performance in this respect" because "[t]o any extent that evidence of the items in issue was not favorable to the petitioner, [] the petitioner's admissions and knowledge of the offenses at the time of his statement to police were so much more unfavorable as to render the evidence of the items in issue inconsequential" [*Id.*].

A fair-minded jurist could reasonably conclude that under *Strickland*, Petitioner did not suffer prejudice with regard to this issue. *See Richter*, 562 U.S. at 103. At trial, Officer Burnette testified that he collected firearms and ammunition from Petitioner's mother's home [Doc. 11-5 at 128]. He also testified that he conducted an investigation of a residence in Fort Oglethorpe and

located a "[g]reen bulletproof vest" in a bedroom closet and a "pistol and two pistol magazines" inside a "small safe" [Doc. 11-5 at 128, 130]. Trial counsel did not object when the State moved to admit the bulletproof vest [*Id.* at 131]. Promptly thereafter, however, a bench conference was held where trial counsel objected to the relevancy of the bulletproof vest and argued that it "could be considered extremely prejudicial" [*Id.* at 132]. The State argued that the evidence was relevant to show that officers were complete in their investigation, given allegations by the defense in "opening statement and jury selection [that] the investigation [w]as lacking" [*Id.* at 132-33].

Following a lengthy argument about whether the items were relevant [*Id.* at 133-38], the trial court allowed photos taken during the search of Angel's home to remain in evidence but marked the bulletproof vest for "identification purposes only" [*Id.* at 138]. The trial court explained to the jury that the vest was "for identification purposes only and should not be considered unless and until it's introduced as evidence" [*Id.*]. The weapons were not introduced as evidence [*Id.*].

Under these circumstances, the admission of the bulletproof vest for identification purposes only did not cause *Strickland* prejudice. Trial counsel effectively argued to have the bulletproof vest withdrawn from evidence, and the jury was then instructed not to consider the bulletproof vest as evidence. "[I]n all cases, juries are presumed to follow the court's instructions." *CSX Transp., Inc. v. Hensley*, 566 U.S. 838, 841 (2009). Further, the weapons were not admitted into evidence or admitted for identification purposes. And Petitioner's detailed confession regarding the night of the crimes, not this information, led directly to his convictions. Any suggestion that the omission of this information would lead to a different outcome is speculation at best. And that is not enough to establish prejudice. *See Richter*, 562 U.S. at 112.

### 5. No Relief Is Warranted Based on Appellate Counsel's Failure To Raise The Issue Of A "Tainted Juror" On Direct Appeal.

That leave's Petitioner's argument that appellate counsel was ineffective in failing to raise the issue of a "tainted juror" on direct appeal. But that argument, too, fails to show a basis for relief under AEDPA. In Petitioner's words, appellate counsel was allegedly ineffective for failing to "raise the issue of whether the trial court erred due to failing to inquire into whether one of the jurors who knew the alleged victim's family discussed the facts of the case with the other jurors" [Doc. 1-1 at 9]. Petitioner asserts that "after the jury had been empaneled, it was revealed that one of the jurors knew the victim's family" [*Id.*]. Petitioner argues that "[a]lthough the trial court released the juror," it "failed to question the juror on whether she discussed the nature of the relationship with the other jurors" [*Id.*]. Petitioner states that "[t]his ambiguity creates doubt as to whether the Petitioner received a fair and impartial jury and trial counsel[10] was ineffective for failing to object and preserve this issue for appeal" [*Id.*].

Petitioner raised this claim on post-conviction appeal only as it relates to ineffective assistance of appellate counsel. *See Moore II*, 2021 WL 4705190, at *20. The TCCA rejected Petitioner's argument. *Id.* The TCCA reasoned:

> [T]he Petitioner contends that he received the ineffective assistance of counsel because appellate counsel failed to raise on direct appeal that the trial court should have declared a mistrial due to a juror discussing facts outside the case with other jurors. We disagree with the Petitioner.
>
> The trial transcript reflects that before the State's opening statement[11], an officer of the court advised the trial court in a bench conference that one of the jurors had told

[10] Any claim related to trial counsel's alleged ineffectiveness is procedurally defaulted because Petitioner did not raise this claim to the TCCA [*See, e.g.,* Doc. 11-29]. And *Martinez* does not excuse the default because the record fails to establish a substantial claim. *See Martinez*, 566 U.S. at 13-14, 16-17. And Petitioner cannot now seek to develop the record further. *See* 28 U.S.C. § 2254(e)(2).

[11] The record reflects that this event occurred during Best's opening statement for the defense [Doc. 11-4 at 32]. But this inaccuracy in the TCCA's factual recitation has no bearing on the resolution of Petitioner's claim.

> the officer that the juror knew the victim's sister. The post-conviction court sent the jury out of the courtroom and had the officer state the issue on the record. The officer said, "Juror No. 70. . . . [She] advised me that she knew the victim's sister . . . . [T]he lady sitting in the audience." Both the State and trial counsel expressed concern about juror number 70 serving on the jury, so the trial court questioned the juror out of the presence of the other jurors. Juror number 70 stated that she thought she used to work with the victim's sister and that she did not see the victim's sister in the courtroom earlier. The trial court dismissed juror number 70 as an alternate, and the State proceeded with its opening statement.
>
> The Petitioner contends that the trial court should have inquired as to whether juror number 70 talked with other jurors about her relationship with the victim's family and that appellate counsel should have raised the issue on appeal. We agree that the better practice would have been for the trial court to question juror number 70 about whether she had discussed the victim's family with other jurors. Regardless, appellate counsel did not testify at the evidentiary hearing, and the Petitioner did not present any proof as to why appellate counsel did not raise the issue. Moreover, the post-conviction court found that there was no proof in the post-conviction record that juror number 70 talked with any other jurors. We agree with the post-conviction court and conclude that the Petitioner is not entitled to relief.

*Id.*

The TCCA's conclusion is supported by a review of the record. At his post-conviction evidentiary hearing, Petitioner testified that "about a day and a half, maybe two days" into trial, "the bailiff came out, . . . and informed [the trial judge] that one of the jurors was talking with the other jurors about knowing . . . the victim's sister and growing up with Mr. Westfield and so forth, stating that he wasn't that type of guy" [Doc. 11-23 at 47]. Petitioner testified that "[t]hey brought [the juror] out and they asked her and they dismissed her" [*Id.* at 48-49]. Petitioner stated that he "informed [trial counsel] to request a mistrial, because, at that time, [he] believe[d] the jury was poisoned, per se, from her insight" [*Id.* at 48]. Petitioner also maintained that he explained his concerns "about the juror" to appellate counsel [*Id.* at 55-56]. Petitioner testified that he reminded appellate counsel about the juror issue when they appeared before the trial court on the motion for new trial, but that it was "never brought [] up" [*Id.* at 57]. Appellate counsel did not testify at the evidentiary hearing.

The post-conviction court noted that the only evidence presented, then, was Petitioner's testimony that the trial court questioned and dismissed a juror who "talk[ed] about knowing the victim's family" [Doc. 11-22 at 131-32]. The post-conviction court found no prejudice in appellate counsel's performance, because "there [was] no proof that the juror was talking with other jurors or did anything more than alert the appropriate officer with her concern" [*Id.* at 132].

On this record, the TCCA's decision reflects a reasonable application of federal law. It could reasonably conclude that under *Strickland*, Petitioner did not prove a basis for relief. The post-conviction court held an evidentiary hearing where Petitioner could develop and present any proof he had to support this claim. And any absence of proof in the record is explained by, and due to, Petitioner's failure to develop and present the proof during the evidentiary hearing. Without proof to support Petitioner's theory that Juror 70 spoke with other jurors about knowing the victim's sister and somehow "tainted" the proceedings, the TCCA's decision rejecting this claim was not an unreasonable application of *Strickland*. And the decision was not based on an unreasonable determination of the facts in light of the evidence presented.

## III. CONCLUSION

For the reasons above, Petitioner has not established a basis for relief under AEDPA. And the Court **DENIES** the Petition and **DISMISSES** this action.

Petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. *See* 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason

would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Applying these standards, no basis for a COA is present. **So, a certificate of appealability from this decision SHALL NOT ISSUE. AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

**SO ORDERED.**

/s/ Katherine A. Crytzer
KATHERINE A. CRYTZER
United States District Judge